T.C. Memo. 1999-334


UNITED STATES TAX COURT


H GROUP HOLDING, INC. AND SUBSIDIARIES, FORMERLY HG, INC. AND
SUBSIDIARIES, ET AL.,[1] Petitioners $\underline{v}$.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket Nos. 616-91, 2012-92,      Filed October 5, 1999.
7994-93, 2423-95,
8532-95.


Harold J. Lipsitz, Robert A. Bedore, and Stephen Fedo, for

petitioners.

Pamela V. Gibson, Donna C. Hansberry, and Steven W.

LaBounty, for respondent.

---

[1] The following cases are consolidated for purposes of
trial, briefing, and opinion: H Group Holding, Inc. and
Subsidiaries, formerly HG, Inc. and Subsidiaries, docket Nos.
2012-92 and 7994-93; and AIC Holding Co. and Subsidiaries,
formerly Anartic Investment Co. and Subsidiaries, docket Nos.
2423-95 and 8532-95.

MEMORANDUM FINDINGS OF FACT AND OPINION

GERBER, <u>Judge</u>:[2]  Respondent determined deficiencies in, and additions to, Federal income tax and penalties as follows:

<u>H Group Holding Inc. and Subsidiaries</u>

| Taxable year ending | Deficiency |
| --- | --- |
| Jan. 31, 1980 | $7,681,409 |
| Jan. 31, 1981 | 5,658,067 |
| Jan. 31, 1982 | 6,677,731 |
| Jan. 31, 1983 | 40,311 |
| Jan. 31, 1984 | 6,768,120 |
| Jan. 31, 1985 | 799,024 |
| Jan. 31, 1986 | 19,397,355 |
| Jan. 31, 1987 | 9,153,141 |
| Jan. 31, 1988 | 13,176,113 |

---

[2]  These consolidated cases were reassigned to Judge Joel Gerber by a Feb. 25, 1999, order, following the death of Judge Theodore Tannenwald, Jr.  The parties agreed that the issues tried to the Court in the trials conducted by Judge Tannenwald could be reassigned to another Judge without the need for a retrial or the presentation of additional evidence.

AIC Holding Co. and Subsidiaries

| Taxable year ending | Deficiency | Penalty sec. 6689 |
|---|---|---|
| Dec. 31, 1976 | $659,483 | --- |
| Dec. 31, 1977 | 1,798,443 | --- |
| Dec. 31, 1978 | 1,420,787 | --- |
| Dec. 31, 1979 | 3,160,729 | --- |
| Dec. 31, 1980 | 12,418,363 | $23,145 |
| Dec. 31, 1981 | 10,660,213 | 5,227 |
| Dec. 31, 1982 | 3,885,657 | --- |
| Dec. 31, 1983 | 4,024,241 | --- |

The issues relating to section 482,[3] the subject of this opinion, have been severed from the other issues in these cases. The issues presented for our consideration are:

(1) Whether respondent's allocations of income (a) for the use of the Hyatt trade name and marks by Hyatt International Corp. (HIC) and its subsidiaries, and (b) for management services HIC provided to its subsidiaries were arbitrary, capricious, or unreasonable; and

(2) the amount of arm's-length consideration, if any, for such transactions.

---

[3] Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

FINDINGS OF FACT[4]

I.  Historical Background

Hyatt Corp. (Hyatt Domestic) is a wholly owned subsidiary of petitioner H Group Holding, Inc. and Subsidiaries (HGH).  HIC is a wholly owned subsidiary of petitioner AIC Holding, Inc. and Subsidiaries (AIC).  All of these entities were organized under the laws of the State of Delaware, and their principal offices at all pertinent times were located in Chicago, Illinois.  The relevant consolidated corporate Federal income tax returns of HGH and AIC (or their respective predecessors) were timely filed with the Internal Revenue Service Center at Kansas City, Missouri.[5]  For the taxable periods in issue, Hyatt Domestic and HIC were owned or controlled directly or indirectly by the same interests, and said control satisfies the threshold for application of section 482.[6]

Hyatt Domestic was organized in 1957.  As of 1968, Hyatt Domestic operated seven hotels in the United States with 2,431 rooms, collectively.  About one-half of the hotels and rooms were

---

[4]  The parties' stipulations of facts and the attached exhibits are incorporated by this reference.

[5]  The issues considered involve petitioners' subsidiaries, Hyatt Domestic and Hyatt International Inc. (HIC) (and its subsidiaries).

[6]  Attached as an appendix is a diagram reflecting the relationships of some of the more significant entities addressed in this opinion.

in California.  At the end of 1968, Hyatt Domestic operated 11 hotels with 3,376 rooms, collectively.  As of January 1976, Hyatt Domestic's operation had grown to 45 hotels with approximately 20,000 rooms, collectively, and 14 motels, with approximately 1,500 rooms, collectively.

HIC was established August 19, 1968, with the principal purpose of owning and/or operating hotel properties outside the continental United States under the Hyatt name.  HIC's initial shareholders were the same as the shareholders of Hyatt Domestic. A. Peter di Tullio, (Mr. di Tullio), HIC's first employee, was hired as executive vice president to guide the international venture.  Mr. di Tullio had experience as an international hotelier and had spent the majority of his career with Hilton International Hotels (Hilton International).  At the time he started with HIC, Mr. di Tullio had been serving as a vice president of Hilton International.  He had worked in Europe, the Middle East, and, to a lesser extent, Asia, and as an area director for Southern Europe, Africa, the Middle East, and Southeast Asia.

By July 31, 1969, Mr. di Tullio, who remained an employee, had hired an assistant and an architect, and he focused on establishing a European base of operations, with an office in Rome.  Around 1971, however, HIC established its headquarters in Chicago, and its three employees were moved from Rome.  By the

end of 1971, the Hyatt International group[7] managed seven hotels located in Hong Kong; Singapore; Manila, the Philippines; Colombo, Ceylon (Sri Lanka); Acapulco, Mexico; Colon, Panama; and Toronto, Canada. Early in the 1970's, Mr. di Tullio hired Moustaffa Bakry, a former vice president of Hilton International in Cairo, to assist in developing the Middle East. By late 1972, the Hyatt International group had executed nine management contracts, and additional management contract negotiations were in process. By 1973, Mr. di Tullio had become president of HIC. From 1969 through 1975, the number of hotels managed by the Hyatt International group grew from a single property in Hong Kong to 19 hotels located on 4 continents. As of the end of 1979, the Hyatt International group managed 28 hotels in 19 different countries. Mr. di Tullio recruited Roland McCann, another former Hilton colleague, to head the Hyatt International group's efforts in the Caribbean and Latin America. During the period from 1976 through 1984, the Hyatt International group added 51 properties in Europe, Africa and the Middle East, Mexico and Central America, and Asia, in addition to those already managed.

On November 29, 1968, Hyatt Domestic and HIC entered into a licensing agreement for use of certain "Licensed Marks" owned by

---

[7] We use the term "the Hyatt International group" to refer to HIC and its subsidiaries collectively or some combination thereof. That term is in contrast to "HIC" or other instances where we have referred to a specific entity.

Hyatt Domestic.  These licensed marks were:  "Hyatt House Hotels", "H. H. & Designs", and "Hyatt Lodges & Design".  Hyatt Domestic granted to HIC the exclusive license to use the marks outside the United States and its territories and possessions, the nonexclusive license to use the marks in Hawaii, Alaska, and the U.S. territories and possessions, and the nonexclusive license to use the marks on printed matter, brochures, and similar products throughout the world.  The agreement also allowed HIC to grant sublicenses to any entity in which it owned at least a 50-percent interest.  HIC agreed that the standards of services and the quality of products bearing a mark would be at least equivalent to those adopted or used by Hyatt Domestic.  HIC agreed to pay Hyatt Domestic $10,000 upon execution of the agreement, plus $10,000 for each new hotel operated under the name "Hyatt".  The expenses of trademark and name registration in foreign jurisdictions were the responsibility of HIC as were the costs of any foreign trademark infringement litigation.  The agreement was signed twice by Jay Pritzker, once as president of Hyatt Domestic and a second time as president of HIC.

On October 22, 1971, Hyatt Domestic authorized HIC to use the "Regency" name in addition to the "Hyatt" name licensed under the 1968 agreement.  The previously established $10,000 fee per hotel, however, was not changed.  On September 24, 1976, the list

of marks licensed was expanded to include various logo designs, advertising slogans, restaurants, and other "Hyatt" names.

II. Organizational Structure[8]

The first international hotel property managed by the Hyatt International group was an entity that became known as the Hyatt Regency Hong Kong. The owners and HIC entered into a management agreement dated June 7, 1969. Generally, the agreement followed the form used by Hilton International, and the name "Hyatt" was substituted for the name "Hilton". On October 28, 1969, Hyatt of Hong Kong (HHK) was incorporated in Hong Kong as a wholly owned subsidiary of HIC, and on October 30, 1969, HIC assigned its interest in the management agreement for the Hyatt Regency Hong Kong to HHK. Mr. di Tullio hired Brian Bryce from Hilton International to be the Hyatt Regency Hong Kong's general manager and the senior vice president of HHK. The Hyatt Regency Hong Kong began operations in November 1969, using the Hilton International registration forms as a model. Other members of the Hyatt Regency Hong Kong executive committee staff were hired from Hilton International, including Ken Mullins, Bernd Chorengel, Larry Tchou, and David Chan.

---

[8] Although the Hyatt International group consisted of numerous legal entities, we limit our description to a sufficient number of representative examples in order to provide an understanding of the group structure.

Generally, separate corporations were formed to execute and/or hold each management contract. Some of the more significant purposes for forming separate entities were to limit liability and take advantage of possible local tax benefits. The separate hotel management companies were usually made wholly owned subsidiaries of either HIC or HHK, and most were incorporated either in the country where the hotel was located or in Hong Kong. Generally, no consideration was paid when management contracts were assigned from a signing entity to a hotel operating entity. On one occasion, however, Hyatt of Singapore (HS) paid HIC $500,000 for the assignment of the management agreement for the operation of the Hyatt Regency Singapore. In numerous instances, HIC guaranteed the performance of the signing subsidiary. HIC was involved in the development of contract opportunities primarily in Central America, Europe, Africa, and the Middle East, whereas HHK was active in the Asia-Pacific area. Ultimately, HHK evolved into a master hotel management subsidiary responsible for the entire Asia-Pacific region.

Hyatt International Canada Ltd. was established in August 1969, as HIC's Canadian subsidiary, and three ground-up hotels were opened, two of which closed by 1979, and the remaining hotel was transferred in exchange for consideration to Hyatt Domestic in 1984.

HS was incorporated in Singapore on August 14, 1970, as a wholly owned subsidiary of HIC for the purpose of holding the Hyatt Regency Singapore management contract. The first management agreement for the Hyatt Regency Singapore, dated May 27, 1970, was executed by HIC and contained a financial guaranty regarding the amount of the hotel owner's share of the gross operating profits. HS has been responsible for the operation of hotels in Malaysia, Indonesia, and Thailand. Although HS is a subsidiary of HIC, it has always reported to HHK. On the advice of tax counsel, HS was assigned the Sydney, Australia, Kingsgate management contract by Hyatt Regency Corp. Pty. Ltd., a wholly owned subsidiary of HHK.

The Hyatt Regency Acapulco (opened in Mexico in October 1971) was the first hotel outside of Asia managed by the Hyatt International group. Ken Mullins transferred from the Hyatt Regency Hong Kong to become the Hyatt Regency Acapulco's first general manager. HIC formed a local management company, Servicios Internacionales Administrativos, S.A. de C.V. (SIASA), a wholly owned subsidiary of HIC, to manage the hotel. Mullins was succeeded as the Hyatt Regency Acapulco general manager by Fred Lederer, and both had been Hilton employees.

On October 24, 1979, the Hyatt International group entered into a joint venture with Valores Industriales S.A. (VIS), Mexico's largest brewer of beer, which already owned and operated

five hotels under its Exelaris banner. The joint venture was called Hoteles Exelaris, S.A. (HESA), and was owned 51 percent by VIS and 49 percent by HIC (Mexico), a wholly owned subsidiary of HIC. HIC's 49-percent ownership was, to some extent unrepresentative in that HIC had contributed about 75 percent of the value and was entitled to about 25 percent of economic returns. After 2 years the profit split was changed to 65 percent for HIC and 35 percent for VIS. Mexican law did not permit greater than 49-percent ownership by a foreign corporation. HESA was established and operated in Mexico; it was a VIS-oriented chain, and it was VIS' intention to exploit the Exelaris name in the marketplace. On each HESA hotel was the name Exelaris, and underneath was the name Hyatt and the name of the city. VIS established an HESA office in Mexico City with approximately 70 to 80 employees. Fred Lederer, then general manager at Hyatt Regency Acapulco, was named as the first director general of HESA. According to the agreement between VIS and HIC (Mexico), Fred Lederer would continue serving as general manager for 18 months, and, thereafter, he would work exclusively for HESA.

The Hyatt International group formed certain companies to provide services that supported its hotel management activities, to wit: Support services companies, hotel consulting and project development companies, and special purposes companies. Support

service companies are principally involved in marketing, sales, reservations, and computer support.  In most instances, these support services were provided by staff at the local hotel level; however, the Hyatt International group also provided support services through separate entities; the most prominent of these was Hyatt Chain Services, Ltd. (HCS).

On January 19, 1971, HCS was incorporated in Hong Kong as a wholly owned subsidiary of HHK.  Essentially a marketing cooperative, HCS provided marketing, sales, and reservation services to the hotels under contract to the Hyatt International group.  HCS also provided guidance to the hotels regarding the development of their own individual marketing programs.  The services provided by HCS are commonly called "chain services" in the hotel industry.  It is understood that chain services also promote a particular hotel chain.  In keeping with industry practice and pursuant to contractual agreements with hotel owners, HCS provided its services at cost.  The costs for HCS were totaled annually and shared pro rata by each hotel based on its room revenue and total number of rooms, subject to limitations based on a certain percentage of revenue.  Such amounts were not considered as income or expense to HCS.  HCS' total annual costs were as follows:[9]

---

[9]  Beginning with 1984, the totals are derived from

(continued...)

| Year | Amount |
|------|--------|
| 1972 | HK$   285,595 |
| 1973 | HK$   372,290 |
| 1974 | HK$   363,948 |
| 1975 | HK$   448,656 |
| 1976 | HK$ 2,532,531 |
| 1977 | HK$ 2,752,146 |
| 1978 | HK$ 2,361,955 |
| 1979 | HK$ 2,177,055 |
| 1980 | US$ 1,921,907 |
| 1981 | US$ 2,300,788 |
| 1982 | US$ 2,990,913 |
| 1983 | US$ 3,227,881 |
| 1984 | US$ 4,681,778 |
| 1985 | US$ 4,309,759 |
| 1986 | US$ 5,934,852 |
| 1987 | US$ 6,519,779 |

HCS maintained sales and marketing offices in several major cities, including Frankfurt, London, New York, Chicago, Los Angeles, Tokyo, Hong Kong, and Singapore.

Hyatt Domestic and the Hyatt International group provided chain services (i.e., marketing, sales, and reservations) for the benefit of each other's hotels.  On or about January 25, 1974, Hyatt Domestic and HIC agreed to charging for the chain services between domestic and international Hyatt hotels.  Hyatt Domestic was to provide a certain amount of chain services for the Hyatt International, to be negotiated annually.  For the services it

---

[9](...continued)
consolidated financial statements of HCS and its subsidiaries, HCS GmbH and Hyatt Reservations SARL.  The certified public accountants who prepared the first consolidated statement indicated that prior years' comparative statements were unnecessary because "The effect * * * is not material".

provided, Hyatt Domestic would charge the Hyatt International group a prorated chain allocation[10] on a per room basis as follows: Non-North American hotels to pay 50 percent of the usual chain allocation; Canadian hotels to pay 75 percent; United States hotels to pay 100 percent. These percentages were based on the perceived relative benefit received by each group of hotels. Effective February 1, 1980, HIC and Hyatt Domestic agreed to represent each other in their respective geographical markets and to separately control and account for their respective expenses. As of 1980, Hyatt Domestic concluded that the exchanged benefits had equalized, so that no further charges were allocated for chain expenses to Hyatt International hotels.

Pursuant to the 1974 agreement, HIC charged Hyatt Domestic the following amounts:

| Taxable year ending | Amount |
|---|---|
| Dec. 31, 1975 | $296,250 |
| Dec. 31, 1976 | 368,746 |
| Dec. 31, 1977 | 489,591 |
| Dec. 31, 1978 | 568,750 |
| Dec. 31, 1979 | 666,080 |
| Dec. 31, 1980 | 56,250 |

HIC's charges for chain-type services were included in Hyatt Domestic's total chain expenses. The total of chain services expense was billed by Hyatt Domestic directly to Hyatt

---

[10] "Chain allocation" refers to the amount determined by the cost-sharing formula applied to chain services.

International group and domestic hotels based on their individual chain allocations.  For 1978, 1979, and 1980, Hyatt Domestic charged the Hyatt International group hotels approximately $1,050,000, $1,200,000, and $1,375,000, respectively.

During 1981, HCS contracted for the development of a computerized reservation system to be called "IMAGE".  David Cook, an HIC employee, spent about a year and a half in Germany training to become the systems manager for IMAGE.  During 1983, Mr. Cook returned from Germany, and IMAGE was installed at Hyatt Domestic's information services headquarters.  Mr. Cook traveled to various cities implementing the IMAGE system.  Another HIC employee trained reservations personnel.  The IMAGE reservations system was not fully implemented.  From 1981 through 1985, HCS expended more than $4 million on the IMAGE system with funds that had been advanced by HHK for the IMAGE system development.

When the Hyatt International group executed a management contract for a hotel that was to be constructed or when a hotel under contract underwent a major renovation, the Hyatt International group frequently provided design consulting services, also known as technical services, to the hotel owners in exchange for a fee.  The Hyatt International group was not prohibited from supplying these services to hotels outside the Hyatt chain.  These fees were earned by and payable to International Project Systems, Inc. (IPS), which was incorporated

in Delaware on February 27, 1974, as a wholly owned subsidiary of HIC. IPS could provide either full or partial technical assistance. Full technical assistance involved comprehensive support of the hotel owner's designers and engineers from the first architectural drawing to the last day of construction, including writing specifications, reviewing internal documents, and reviewing and critiquing back room operational designs. In contrast, partial technical assistance involved taking over a project that is either under construction or fully built and operating.

IPS offered consulting services on a hotel's design (by approving or recommending the architect's drawings), but it was not responsible for overall design. It also could recommend sources for the wide range of items--from structural building members to bedding--that a hotel might need. Occasionally, IPS subcontracted aspects of the project to other companies. In most cases, however, IPS established a flat fee for the specific technical services it would provide to a hotel, purportedly based on the Hyatt International group's experience with the anticipated expenses. During most of the years at issue, IPS' expenses exceeded its revenues.

The Hyatt International group maintained an operational structure allowing for general strategies to be created and organized at the top corporate level. The choice to implement

general strategy remained with the individual hotel's management. Rather than strive for uniformity of appearance and accommodations in its properties, the Hyatt International group was able to develop and manage unique hotel properties. Each property was fashioned to be culturally correct and geographically distinct within a particular country. Guests were thereby permitted to recognize or appreciate a local character while enjoying a high level of service. In spite of that flexibility, the Hyatt International group, in substantially all cases, has used the name Hyatt in the hotel names and used the Hyatt logos and slogans, such as "Don't you WISH YOU WERE HERE[SM]" and "touch of Hyatt".

III. <u>Modus Operandi of Hyatt International Group</u>

While the Hyatt International group has taken some equity positions and in limited circumstances has been involved in hotel leases, its modus operandi has, generally, been to pursue management contracts as a means to expand the Hyatt chain and to increase profitability. In the international hotel business, the management contract approach places much of the operating risk on the owner, not the manager. Consequently, the owners' rewards are also greater, and they generally receive the larger share of the hotel operating profits and the benefit from appreciation in capital value.

Basically, the hotels connected with the Hyatt International group's business can be classified in three general categories: "takeover[s]", "shell[s]", and "new hotel[s]". Takeovers involve hotels where one management company succeeds another in managing a property that is fully operational. When a management company becomes involved during hotel construction, it is called a shell. Because the shell's building is partially constructed, the fundamental design is incomplete, and the opportunity remains for design revisions. Through the mid-1980's, the majority of the Hyatt International hotels were either takeovers or shells, leaving the Hyatt International group with little or no influence over the design of the hotels. In the case of "new or ground-up" hotels the management company is involved from the start of the hotel project design and prior to any construction. Most of the Hyatt International hotels opened after 1985 have been ground-up properties where there was involvement in the design of the hotel.

To be effectively involved in the design, a hotel management company must work closely with the hotel owner or its representative, the architects, and the project manager. The hotel owner or its representative is the primary force behind the hotel development, making the choice of architect, project manager, and the type of property to be built. For example, the owner may choose a luxury, business, or economy-type hotel. The

owner also chooses the basic image that the hotel property will project. The hotel architects receive design manuals and an area program describing in great detail how the Hyatt International group believes the hotel layout should blend with the management agreement. The architects, however, are generally free to design the hotel according to their experience and imagination, combined with the focus and intent of the owner. The project manager is the hotel owner's on-site construction liaison, serving as the link between the owner and the Hyatt International group.

It takes about 3 to 4 years to develop a hotel. The amount of design consulting provided by the Hyatt International group varied depending on the particular hotel, the nature of the Hyatt International group's relationship with the hotel owner, and the owner's requirements, and budget. Though not all hotels choose to utilize IPS' consulting services in the facility design, the Hyatt International group generally provided guidelines, concepts, and recommendations throughout the process; it established performance criteria and minimum requirements for each hotel. The design manuals provided to each hotel owner/developer outlined the standards established by the Hyatt International group for the property. The standards were based on service characteristics and the scope of operations of each hotel; that is, the number of food and beverage outlets and rooms.

HIC issued a pro forma letter stating that the manuals are guidelines and that the standards are not intended to be rigidly applied by every hotel in every instance.  These guidelines served as minimum specifications, essentially providing the Hyatt International group with a way to withdraw from a project without liability if the specifications are not met.  The guidelines were developed over a period of years and contain a compendium of Hyatt institutional experience.  HIC also provided hotel equipment standards books containing the detail of the items needed to stock and furnish the hotel exclusive of the guest rooms, public areas, and major kitchen equipment.  At least one volume of the three-volume book of equipment standards had to be customized for a particular hotel.

A significant strength of the Hyatt International group was its capability to provide the hotel owner with an assembled work force, including senior management, general managers, and behind the scenes or back room service hotel personnel.  Hyatt International group's senior management consisted of HIC's senior executives, including the president and chief executive officer as well as a number of vice presidents with functional responsibilities for legal matters, finances, marketing, technical services, and human resources.  It also included HIC executives in charge of geographic regions, such as senior vice presidents and their directors with functional responsibilities.

These executives, organized by geographic regions, either worked for one of HIC's master hotel management subsidiaries or for HCS. Hyatt International group's senior management assumed primary responsibility for developing relationships with hotel owners and maintaining their trust.  Generally, management contracts were sourced in personal relationships with owners, and those relationships were important to the success of the Hyatt International group's management and operational systems.

The general manager, in effect, operated as the chief executive officer of the hotel.  Each general manager had the power to make day-to-day decisions, interact with the owner, and generally run the hotel as an autonomous business.  Offers of employment for general managers were prepared and executed by authorized Hyatt International divisional or regional personnel on divisional or regional letterhead.  Owners generally recognized the general manager's importance and tended to rely on the Hyatt International group to provide personnel who would be key to the hotel's success.  The owners worked with the hotel's general manager to ensure that their interests were being pursued and generally looked to the general manager when they had any operational questions.  In general, the owner's involvement was limited to participation in general management activities, such as budgeting and finances; original, amended, or renewed management contracts; hotel design and renovations; general

manager appointments; and legal, economic, and political risks. Owners relinquished day-to-day operations of the hotel to the general manager and other members of the hotel's executive committee.

While the general manager was principally responsible for hotel management, the general manager relied upon the hotel executive committee for operational and strategic support. The executive committee typically consisted of five to eight people: Including the key department heads in the hotel, including the resident manager; directors of rooms, food and beverage, human resources, engineering, and sales/marketing; the executive chef; and the financial controller.

The general manager was responsible for recruiting personnel, setting pay rates, labor union negotiations, and conducting the initial training. The general manager was assisted in these matters by the Hyatt International group management subsidiaries. The hotel's director of human resources was responsible for the actual hiring of the operational personnel and had to be aware of and sensitive to local working conditions, labor laws, religious and cultural mores, which differ from hotel to hotel. The director of human resource positions were filled through the coordinated efforts of the general manager and the divisional director of human resources.

The director of sales and/or marketing was responsible for bringing in customers to the hotel, and was usually engaged about 6 to 9 months prior to a hotel's opening in order to analyze the business traveling pattern of the city and locate likely sources of business.  Room revenues were usually derived from independent travelers, tourists, incentive groups and tours, corporate rate guests, and special rate guests, such as airline crews.  The hotel had to find the appropriate market mix and aggressively pursue new guest and customer markets in order to be successful, remaining flexible and responding to any market shifts.  Some of the business was generated locally from companies and local travel agents.  The director of sales/marketing and the general manager were responsible for negotiating with local companies and travel agents and qualifying them for special rates in exchange for the guaranty of a certain number of room nights.

Marketing performed by individual hotels differs from chain-service marketing.  For chain marketing, the strengths of a particular property may be featured, but the overall purpose is to promote the global chain.  For example, Hyatt International group's brochures may focus on a single hotel, but also provide reservation information for other Hyatt International hotels and publicize one or more Hyatt International hotels in the same area.  Establishing a local presence was the general manager's

responsibility with the assistance of the other members of the executive committee.

For the Hyatt International group, the food and beverage revenue was as integral to a hotel's success as the room revenue. Decisions about what type of food and beverage service to offer were made by the general manager and area directors; HIC did not provide a master plan or instruct hotels as to the kind of restaurant, bar, or cafe services to offer.

"Back-of-the-house" operations refers to support services that are performed behind the scenes in a hotel, including engineering, maintenance, accounting, and management information systems. Back-of-the-house operations were within the exclusive purview of the general manager and executive committee. The general manager and executive committee were also responsible for managing other hotel departments, including telephones, foreign exchange, laundry, and membership clubs such as fitness and/or golf.

The engineering or technical services departments of hotels were responsible for hotel maintenance and safety. That job is basically standard from hotel to hotel, but may vary according to local government rules, regulations, and license requirements.

The hotel controller is responsible for the books and accounts of the hotel operation and for maintaining the accounting records of the hotel. A uniform system of accounts

for hotels was used by all Hyatt International hotels.  Thousands of transactions can take place during any given day.  For example, if a 500-room hotel is 80 percent occupied with an average of two occupants per room and each occupant purchases one meal in the hotel per day, a total of 1,200 transactions takes place during the day (400 rooms plus 800 food and beverage transactions).  Each guest can generate additional transactions by using the laundry, making purchases at the sundry store, and using the business center, telephone, or health club.  Financial controls at the local hotel level and its effect on the chain operation are extremely important.

The operational personnel consisted of individuals who worked in nonexecutive hotel positions and reported to executive committee members; e.g., front desk clerks, banquet captains, restaurant waiters, bartenders, and maintenance personnel.  The operational personnel represented the largest human resource group in the Hyatt International group.  Recommendations regarding the compensation of staff were made by the executive committee and approved by the general manager.

The hotel general manager and executive committee were largely responsible for preopening activities, although certain preopening responsibilities were undertaken at the divisional level.  Included in successful preopening management activities were:  Overall planning, staffing, setting up the physical plant,

and marketing. Preopening activities were more important and more elaborate for new hotels than for takeovers, although takeovers did require some preopening preparation. For a new hotel, a general manager was generally designated and assigned 12 to 18 months prior to opening.

The owner was responsible for paying preopening expenses, including the cost of training. After the opening, the owner was responsible for paying management fees and hotel operating expenses. The Hyatt International group's management fees generally were expressed as a percentage of revenue and/or gross operating profits. To avoid certain countries' local withholding taxes, the management fees were characterized or described in a few contracts as royalties. Each hotel's revenues, expenses (including payroll), and assets were carried on its own books and were not recorded by or shown in the books of any Hyatt International entity. The Hyatt International group, however, was responsible for managing the employees and the assets and for generating each hotel's revenues.

Hyatt International's ability to retain management contracts was dependent upon two factors: (1) Satisfying hotel owners and (2) generating sufficient revenue to ensure a successful arrangement for both the owners and the Hyatt International group. For both of these factors, the hotel general manager played a significant role. Occasionally, management contracts or

leases were terminated for various reasons, including the following: (1) An owner might become dissatisfied with Hyatt International's management. For example, the contracts for the Hyatt Regency Toronto and Hyatt Vancouver Airport, two of the three Canadian Hyatt International hotels, terminated due to the owners' dissatisfaction with the operating results and failure to meet the contractual profit targets, respectively. (2) Conversely, the Hyatt International group might become dissatisfied with the owner, including the owner's unwillingness to renovate the property. (3) Forces of nature or the effect of politics can be the cause of involuntary termination.

A strong owner-management relationship is essential to implement necessary improvements to hotels because owners are not usually eager to bear the high costs of improvements. By the mid-1980's, the Hyatt International group's growth enabled it to be more selective in its management relationships. At that time, the group began eliminating poor performing and below-standard properties.

The Hyatt International group played an important role in the careers of the people hired and was responsible for determining hotel employees' compensation. Employees hired for management positions were subject to being reassigned to other hotels. The Hyatt International group identified promising hotel staff members and positioned them for promotion at their current

or another hotel.  When planning a new hotel location, the Hyatt International group looked for experienced chain employees for the general manager and executive committee for the new hotel. Generally, the general manager and area directors recommend executive committee staff for transfer and promotion.  The selection and transfer of general managers and certain executive staff, however, required HIC's approval.  Similarly, senior staff recommendations for the general manager's and executive committee member's compensation was also subject to HIC's approval.  From their first position, employees knew their career would be determined by the Hyatt International group, not the hotel owner.

The general manager and executive committee staff at certain Asian flagship hotels, such as the Hyatt Regency Hong Kong and the Hyatt Singapore, served concurrently in senior executive positions with HHK and HS.  Initially, the salaries of HHK and HS employees and related overhead expenses were paid entirely by the hotels.  Later, a portion of those salaries was paid by the Hyatt International master hotel management subsidiaries, after they assumed increased responsibility for new hotels.  In the early 1980's, HHK began to hire and pay full-time clerical staff and specialists in positions such as marketing, food and beverage, engineering, and finance.  For certain hotels, the executive staff (usually general managers and controllers) continued to have dual roles.  For example, Brian Bryce, the first general

manager at the Hyatt Regency Hong Kong, was also a vice president for HIC; David Chan was controller at Hyatt Regency Hong Kong and area controller for HHK; Bernd Chorengel was general manager at Hyatt Regency Singapore at the same time that he was area director, and then senior vice president, for Southeast Asia at HS.

IV. <u>HIC's Role Within the Hyatt International Group</u>

An attempt was made to insulate the Hyatt International group from day-to-day hotel operations and from legal issues such as guest complaints or injuries. These matters were primarily dealt with at the local hotel level by the general manager, the owner's representative, and/or the hotel's counsel. HIC rarely became involved in these matters, although it was made aware of significant developments by its master management subsidiaries and/or the general managers. "Slip-and-fall" personal injury cases were handled at the hotel level and monitored by the relevant management subsidiary or HIC. The management subsidiaries engaged their own legal counsel for employment matters. HHK used Hong Kong lawyers for tax advice and legal liability concerns. The subsidiary companies, therefore, while relying on local counsel, involved HIC whenever there was a question of exposure to liability for the subsidiary or the entire Hyatt International group. HIC coordinated the purchase of business liability and other types of hotel operating

insurance for individual hotels, charging each hotel an allocated portion of the cost.

Prior to 1984, HIC's senior vice president for development reviewed management contracts because HIC did not have in-house counsel. For later years, when HIC had equity participation in a hotel and/or Hyatt 's money was at risk, HIC's legal department played an integral role in the legal aspects of the transaction. Legal counsel promoted the formation of separate corporations within the Hyatt International group so that the risk of legal liability would fall on individual hotels instead of the group. The legal department tracked the registration of the Hyatt trade names and marks in foreign jurisdictions, employing a U.S. law firm, which in turn contracted with a foreign law firm to perform the work. The tracking was primarily for cost containment of registration expenses.

HIC's chief financial officer was responsible for maintaining the financial accounting records of HIC and its U.S. subsidiaries within the consolidated group. He was also responsible for preparing consolidated financial statements for use by HIC's board and during the annual audit, preparing Federal and State tax returns and meeting other governmental filing requirements, and managing the annual certified audit process. HIC's staff internal auditor was sent to review books and records of hotels and subsidiaries.

HIC coordinated the sales and marketing activities of its subsidiaries, including the worldwide sales and reservations offices, which fall under the responsibilities of the area marketing directors.  The marketing vice president coordinated the consistency of hotel advertising and graphic design and conducted third-party marketing efforts with major airlines, credit card companies, and travel consortia.  Hotel marketing staff, however, wrote the advertising text, and individual local hotels paid for advertising costs out of their own budgets.

The hotel operations vice president supervised HIC office functions, including marketing, personnel, food and beverage planning, and systems analysis.  It was this vice president's responsibility, and that of HIC generally, to set standards of service, but not to manage the hotels.  This vice president received and reviewed the various hotel reports, including budgets and monthly reports of activity.  He reviewed, discussed, and made suggestions concerning these reports throughout all organizational levels of the Hyatt International group.  In accord with Hyatt International group operations, hotel and area staff initiated and implemented the management plans, with HIC providing final approval or mediating differences between hotels or geographical areas on various topics, such as staff transfers. HIC also maintained a food and beverage department that

coordinated and exchanged information throughout the chain regarding that subject matter.

HIC's human resources vice president acted as the clearinghouse for human resources policies and procedures, personnel director for the HIC corporate office and the Hyatt International sales offices located in the United States, and as liaison to the third-party administrator for worldwide benefits and retirement plans.  HIC instructed its hotels to buy life insurance for the hotels' employees and arranged for a life insurance provider.  HIC also arranged a provider for employee medical insurance.  The hotel owners, however, paid the insurance premiums.

As of January 1, 1975, HIC established the "Hyatt International Salaried Employees' Retirement Plan".  On or about February 26, 1981, HIC initiated "The Money Accumulation Pension Plan for Third Country National Employees of Hyatt International Corporation", effective January 1, 1980.  Contributions to the plan were funded by the owners of the hotels at which the plan participants were employed.

In 1981, HIC inaugurated the HIC Incentive Compensation Program for the general managers of Hyatt International hotels. Under the program, a general manager could qualify for a monetary award, which was paid by the employing hotel.  General manager

incentive compensation was measured by objective (operational performance) and subjective evaluation by HIC personnel.

The performance of general managers and executive committees was considered to be good for most local personnel matters in the Hyatt International group. Training, on the other hand, was an area in which they did not perform as well. General managers and executive committees did not have access to effective "off-the-shelf" training material, and they did not have sufficient resources or time to develop adequate in-house local personnel training programs. To remedy this, Hyatt International provided the "Training for your future" program that was offered to hotel employees worldwide beginning in 1985.

Hyatt International group developed hotel management and operation policy and procedures manuals. HIC acted as a clearinghouse for the preparation of the manuals, and portions were written by area specialists and hotel staff. HIC was responsible for the distribution of manuals to new hotels and for asking the field for updates. After updates were prepared, HIC coordinated the updates and distributed them to the appropriate hotels. General managers were responsible for their respective hotel's operating manuals, the food and beverage directors were responsible for their departmental manuals, and the chefs were responsible for their own menus and recipes.

As early as March 1975, HIC distributed a controller's checklist for reports. In 1981, HIC copyrighted a manual entitled "Accounting and Internal Control Systems and Procedures". This manual was written at the request of the area and hotel accounting staff and was provided to hotel controllers who also assisted in its review. The manual provided standardized reporting and accounting controls, facilitating a uniform budget process and the ability to move accounting personnel between hotels. It was also used to train the accountants in Mexico. Effective March 1, 1983, HIC promulgated materials describing specialized policies and procedures for the areas of law and insurance, administrative/general, and finance/ accounting. Some of the topics included: Technical assistance agreements, management agreement obligations, area vice president hotel visits, annual business plan, reports schedules, and inter-hotel financial transactions.

HIC vice presidents would occasionally visit the hotels, generally accompanied by the area vice presidents, to make inspections and recommendations. Periodically, the Hyatt International group would hold meetings of general managers. At these meetings, general managers met with HIC and senior executives of management subsidiaries to review the growth and development of the Hyatt International group. The general managers also exchanged ideas and information on what made their

hotels successful.  Data were also exchanged on candidates for promotion to various positions.

## V.   Agreements Between Hyatt International Group Entities and Hotel Owners[11]

### A.   Hyatt Aryaduta Jakarta Agreement

On December 18, 1975, the owners of the Aryaduta (Ambassador) Hotel located in Jakarta, Indonesia, and HHK entered into a 10-year management agreement.  The owners agreed to refurbish the existing hotel and to complete certain unfinished floors.  The parties agreed that the hotel name would be changed to the "Hyatt Aryaduta Hotel".  In the early 1980's, Andre Pury, the Hyatt International regional director for Indonesia, initiated negotiations with the Hyatt Aryaduta Hotel owners for further renovations and an extension of the management contract. On October 16, 1981, the owners entered into an agreement with IPS for the renovation, but the work was delayed for several years.

Around the same time, Mr. Pury located a group of investors interested in constructing a new hotel in Jakarta to be known as the Grand Hyatt Jakarta.  Included in the investor group was the son of Indonesia's President Suharto.  The new hotel was intended to be at the top end of the Jakarta hotel market, in contrast to

---

[11]   Only selected agreements have been addressed in the findings of fact to show patterns or the types of contractual relationships that were utilized.

the Hyatt Aryaduta which was ranked fifth or sixth.  Near the conclusion of the negotiations, the investor group demanded that the Grand Hyatt Jakarta be the only Jakarta hotel to display the Hyatt name.  Mr. Pury conveyed this demand to the Hyatt Aryaduta owners, who were aware that President Suharto's son was involved in the new hotel.  On January 1, 1986, the Hyatt Aryaduta Hotel owners agreed to permit HHK, at its election, to remove the Hyatt name in exchange for a reduction in management fees from 3 to 2.5 percent and a reduction in incentive fees from 10 to 5 percent.  In addition, the Hyatt Aryaduta Hotel owners also agreed to construct, furnish, and equip a 132-room extension.

On January 14, 1986, HHK entered into a management agreement for the Grand Hyatt Jakarta, which opened in March 1991.  Around the same time, the Hyatt Aryaduta's name was changed to The Aryaduta.  Both hotels were very successful operations for HHK.

B.  Century Hyatt Tokyo Agreements

Odakyu, a Japanese conglomerate of public and private companies, among its other business activities, provides travel and construction services and owns real estate, department stores, railway lines, and hotels.  Odakyu owned three hotels and a national travel agency in Japan.  The hotels were operated under the Century Hotel name and logo, which was registered by Odakyu in Japan.  Typical of Japanese hotel owners, Odakyu did not wish a management contract relationship and preferred a

franchise agreement.  The Hyatt International group, on the other hand, was opposed to franchising.

As a result, on March 16, 1979, a compromise agreement was signed, under which Odakyu would operate the hotel, and the Hyatt International group would provide sales, reservations and information services, manuals, policies and training materials, and related materials, all of which are made available to hotels involved with the Hyatt International group.  In exchange, Odakyu agreed to pay $300,000 per year for 3 years and the greater of $300,000 per year or 10 percent of gross room revenues received from non-Japanese guests thereafter.  In addition, at Odakyu's request, Hyatt International would make available numerous optional services, including purchasing, operational management services, and technical assistance for these services; generally, Odakyu would pay at cost.  Odakyu was allowed the use of the Hyatt names, with Hyatt International's written approval prior to using the Hyatt name on the hotel.  Odakyu agreed to promote Hyatt International hotels by including the display of materials in the rooms and lobby areas of its hotels and making reservations for other Hyatt International hotels.

An August 22, 1979, amendment replaced the $300,000/10-percent terms with a fixed $100,000 annual royalty for a 10-year term in exchange for Odakyu's use of the Hyatt name.  In addition, the amendment provided for Hyatt International to

receive, in return for performance of sales and reservation services and information services outside Japan, $200,000 per year for the first 3 years and thereafter the greater of $200,000 per year or 10 percent of annual gross room revenue of non-Japanese guests.  After 3 years, the annual amount for services was reduced to $100,000.  In this amendment, Hyatt International, S.A., assigned the rights to the agreement to HHK, as permitted by the original agreement terms.  In an October 1, 1984, amendment, the fee for services was changed to a fixed fee of Yen68,301,156 for the period September 15, 1983, to March 31, 1984, and the greater of $200,000 per year or 8 percent of annual gross room revenue from nationals of countries other than Japan. Here again the annual amount was reduced to $100,000 after March 31, 1984.

   C.  <u>HESA Agreements</u>

   On October 24, 1979, in conjunction with the establishment of HESA by VIS and HIC (Mexico), HESA and HHK entered into a consultancy agreement under which HHK was to provide management services and preopening support.  HESA and HHK also entered into an agreement for the use of the Hyatt names and marks and the provision of chain services.  HESA agreed to pay HHK an amount equal to 75 percent of the management fees received, less administrative expenses incurred in the supervision of hotel operations.  This agreement included a royalty of 2 percent of

the gross income for each HESA hotel that used the Hyatt names and marks and for chain services.  In the case of the Hyatt Regency Acapulco, however, which was already a Hyatt International hotel, HIC (Mexico) would receive 90 percent of the fees (including 15 percent for SIASA), without regard to the administrative expenses incurred in connection with that hotel.

During 1982, due to the increased number of hotels under HESA management, the agreement between HESA and HHK was amended, reducing the percentage HESA was to pay HHK as a fee for services and reducing the royalty for the trade names and chain services from 2 to 1 percent of hotel gross income.

D.  Atrium Hyatt Budapest Agreements

The Atrium Hyatt Budapest opened during June 1982.  The agreement concerning this hotel was in the nature of a franchise. The Hyatt International group agreed to provide technical services, preopening services, management expertise, and chain services, in addition to allowing the use of the Hyatt trade names and marks.  The parties agreed that the general manager was to be chosen by the hotel and trained by the Hyatt International group.  The Hyatt International group agreed to provide training at its existing hotels for other key personnel.  For 3 years, the hotel agreed to pay $1.50 per day for each occupied room, plus a percentage of room revenue for reservations booked through Hyatt International services, and a percentage of revenue from room,

food and beverage, and incidentals for guest groups booked through the Hyatt International group. Effective July 1, 1985, the parties amended the remuneration for another 3-year period at a rate of $200,000 annually in exchange for management expertise and chain services, including reservations.

E. Hyatt Regency Brussels Agreement

On January 12, 1973, HIC entered into an agreement to manage and lease a hotel that was to be constructed and would be known as the Hyatt Regency Brussels. The terms of the lease provisions included a guaranteed rental to be paid to the hotel owner. The owner, Belgium Hotels Leasing Partnership, was owned by the principal stockholders of HIC (95 percent) and Mr. di Tullio (5 percent). The agreement was assigned by HIC to Hyatt Management, Inc., a Delaware corporation wholly owned by HIC. The hotel operated at a loss from its 1976 opening through 1986.

F. Hyatt Regency Nice Agreement

The Hyatt Regency Nice opened during July 1979 and closed during November 1983. Hyatt International (France) was created in France in 1976 to hold the management contract for the Hyatt Regency Nice. Hyatt International (France) was owned 90 percent by HIC and 10 percent by HHK. The management agreement included a minimum annual payment to the hotel owner from Hyatt International (France) that was guaranteed by HIC. The hotel, Société d'Exploitation Niçoise, was owned 39.6 percent by the

principal stockholders of HIC, 10 percent by an HIC subsidiary, and 50.4 percent by unrelated parties.

VI.  <u>Financial Information</u>

The consolidated financial statements of HIC and its subsidiaries reflect the following revenue and expenses:

|  | Domestic[1] | Foreign | Total |
|---|---|---|---|
| **1976** | | | |
| Revenue | $1,624,803 | $4,382,067 | $6,006,870 |
| Expenses | 2,623,993 | 423,064 | 3,047,057 |
|  | (999,190) | 3,959,003 | 2,959,813 |
| **1977** | | | |
| Revenue | 2,783,886 | 4,815,825 | 7,599,711 |
| Expenses | 4,209,828 | 229,254 | 4,439,082 |
|  | (1,425,942) | 4,586,571 | 3,160,629 |
| **1978** | | | |
| Revenue | 4,580,779 | 6,363,780 | 10,944,559 |
| Expenses | 5,231,623 | 719,237 | 5,950,860 |
|  | (650,844) | 5,644,543 | 4,993,699 |
| **1979** | | | |
| Revenue | 1,791,770 | $8,665,739 | 10,457,509 |
| Expenses | 5,478,207 | 552,785 | 6,030,992 |
|  | (3,686,437) | 8,112,954 | 4,426,517 |
| **1980** | | | |
| Revenue | 2,085,787 | 11,948,337 | 14,034,124 |
| Expenses | 7,777,161 | 712,218 | 8,489,379 |
|  | (5,691,374) | 11,236,119 | 5,544,745 |
| **1981** | | | |
| Revenue | 3,324,344 | 13,434,924 | 16,759,268 |
| Expenses | 7,079,795 | 1,285,992 | 8,365,787 |
|  | (3,755,451) | 12,148,932 | 8,393,481 |
| **1982** | | | |
| Revenue | 2,447,592 | 13,491,587 | 15,939,179 |
| Expenses | 8,481,592 | 3,289,469 | 11,771,061 |
|  | (6,034,000) | 10,202,118 | 4,168,118 |

[1]The category "Domestic" includes those Hyatt International entities incorporated in the United States, including HIC, IPS, and the management subsidiaries for hotels in Canada, Brussels, and Central America.

Included in the above expenses are losses on leased

operations and on guaranties for hotels in Brussels and Nice, as

follows:

|       |           | As percentage of expenses | |
| Year  | Amount    | Domestic | Consolidated |
|-------|-----------|----------|--------------|
| 1976  | $648,604  | 25       | 21           |
| 1977  | 1,841,960 | 44       | 41           |
| 1978  | 2,269,444 | 43       | 38           |
| 1979  | 2,075,582 | 38       | 34           |
| 1980  | 3,749,346 | 48       | 44           |
| 1981  | 2,600,408 | 37       | 31           |
| 1982  | 1,343,006 | 16       | 11           |

The financial statements of HHK and its subsidiaries and of HS reflect the following revenue and expenses:

|          | HHK and subs. | HS          | Total        |
|----------|---------------|-------------|--------------|
| **1976** |               |             |              |
| Revenue  | $2,812,771    | $668,338    | $3,481,109   |
| Expenses | 156,727       | 88,478      | 245,205      |
|          | 2,656,044     | 579,860     | 3,235,904    |
| **1977** |               |             |              |
| Revenue  | 2,899,989     | 1,211,452   | 4,111,441    |
| Expenses | 136,544       | 142,185     | 278,729      |
|          | 2,763,445     | 1,069,267   | 3,832,712    |
| **1978** |               |             |              |
| Revenue  | 3,490,563     | 1,739,405   | 5,229,968    |
| Expenses | 473,222       | 187,634     | 660,856      |
|          | 3,017,341     | 1,551,771   | 4,569,112    |
| **1979** |               |             |              |
| Revenue  | 5,119,704     | 2,174,035   | 7,293,739    |
| Expenses | 448,755       | 205,822     | 654,577      |
|          | 4,670,949     | 1,968,213   | 6,639,162    |
| **1980** |               |             |              |
| Revenue  | 8,962,047     | 2,769,148   | 11,731,195   |
| Expenses | 909,374       | 171,175     | 1,080,549    |
|          | 8,052,673     | 2,597,973   | 10,650,646   |
| **1981** |               |             |              |
| Revenue  | 10,684,784    | 2,832,835   | 13,517,619   |
| Expenses | 937,873       | 283,106     | 1,220,979    |
|          | 9,746,911     | 2,549,729   | 12,296,640   |

1982

| | | | |
|---|---|---|---|
| Revenue | 10,413,189 | 2,294,179 | 12,707,368 |
| Expenses | 2,834,416 | 272,547 | 3,106,963 |
| | 7,578,773 | 2,021,632 | 9,600,405 |

Beginning with 1983, HHK's financial statements contained the amount of overhead expenses allocated to HHK from HIC for services performed on behalf of HHK.  The 1983 allocation included payment for services performed in prior years and was the result of an Internal Revenue Service audit.  The overhead expenses allocated to HHK from HIC for services performed on behalf of HHK were reflected as follows:

| Year | Amount |
|---|---|
| 1983 | $2,503,692 |
| 1984 | 198,422 |
| 1985 | 228,740 |
| 1986 | 249,872 |
| 1987 | 261,361 |
| 1988 | 326,512 |

HHK and HS had retained earnings before and after payment of dividends to HIC.  The amount of the dividends and retained earnings after dividend payments for the years 1976 through 1987 were as follows:

|  | Hyatt of Hong Kong | | Hyatt of Singapore | |
| --- | --- | --- | --- | --- |
| Year | Dividends | Retained earnings | Dividends | Retained earnings |
| 1976 | --- | $8,598,528 | $1,181,383 | $1,245,134 |
| 1977 | $921,000 | 10,018,226 | 359,161 | 702,308 |
| 1978 | 2,100,000 | 10,521,245 | 1,288,798 | 1,248,311 |
| 1979 | 3,520,000 | 10,974,344 | 954,103 | 1,056,059 |
| 1980 | 11,099,930 | 6,477,453 | 1,481,926 | 1,624,401 |
| 1981 | 5,050,000 | 10,660,914 | --- | 1,625,955 |
| 1982 | --- | 17,783,063 | --- | 2,823,777 |
| 1983 | 2,038,283 | 18,926,781 | --- | [1]7,791,000 |
| 1984 | 16,325,000 | 9,723,525 | --- | [1]9,275,000 |
| 1985 | --- | 6,267,334 | --- | [1]9,606,000 |
| 1986 | 9,000,000 | 5,063,406 | --- | [1]11,666,000 |
| 1987 | 10,150,000 | 9,206,112 | [1]91,000 | [1]11,853,000 |

[1]Figures denominated in Singapore dollars.

For most of the taxable years under consideration, the majority of HIC's income consisted of dividends and the remainder of HIC's income consisted of operating income or interest.  For most of the years, the reported expenses of IPS' and HIC's U.S. hotel management subsidiaries exceeded their revenues.

VII.  Respondent's Determinations

Respondent determined, in the notices of deficiency sent to HGH, increased income for Hyatt Domestic as follows:

|               | Trade name  |
| Taxable year  | adjustment  |
| ---           | ---         |
| Jan. 31, 1980 | $2,159,000  |
| Jan. 31, 1981 | 3,266,000   |
| Jan. 31, 1982 | 4,603,000   |
| Jan. 31, 1983 | 5,279,000   |
| Jan. 31, 1984 | 5,548,000   |
| Jan. 31, 1985 | 6,070,000   |
| Jan. 31, 1986 | 5,735,687   |
| Jan. 31, 1987 | 5,935,143   |
| Jan. 31, 1988 | 7,333,495   |
| Total         | 45,929,325  |

The October 12, 1990, notice of deficiency contained the following explanation for the 1983 through 1985 tax years:

> It has been determined that an adjustment be made in accordance with the provisions of Internal Revenue Code Section 482 and the regulations thereinafter to increase your income for the value of the trade name "Hyatt". Accordingly, your taxable income for year ended January 31, 1983; January 31, 1984 and January 31, 1985 have been increased in the amounts of $5,279,000; $5,548,000 and $6,070,000 respectively.

The Explanation of Items in the October 28, 1991, notice of deficiency for HGH's taxable years 1980 through 1982 states:

> Hyatt Corporation (HC) engaged in transactions with Hyatt International Corporation (HIC), relating to HIC's use of "Hyatt" trade names, trademarks, and other intangible assets, which were not at arm's-length terms. Pursuant to section 482 of the Internal Revenue Code and Treas. Reg. §1.482-2(d), it is determined that an arm's-length royalty or license fee for these transactions equals 1.5% of the gross revenues of each hotel operated under the "Hyatt" name by HIC or any of its subsidiaries. * * *

The January 27, 1993, notice of deficiency for HGH's 1986 through 1988 tax years contained the same above-quoted explanation.

Respondent, in the notices of deficiency addressed to petitioner AIC, determined that the income of its subsidiary HIC income should be increased as follows:

| Taxable year ending | Trade name | Management fees | Total of these items |
|---|---|---|---|
| Dec. 31, 1976 | $982,000 | $1,601,467 | $2,583,467 |
| Dec. 31, 1977 | 1,086,000 | 2,048,740 | 3,134,740 |
| Dec. 31, 1978 | 1,495,000 | 2,296,218 | 3,791,218 |
| Dec. 31, 1979 | 1,877,010 | 3,300,716 | 5,177,726 |
| Dec. 31, 1980 | 3,094,935 | 5,070,618 | 8,165,553 |
| Dec. 31, 1981 | 4,157,250 | 4,852,581 | 9,009,831 |
| Dec. 31, 1982 | 4,838,580 | 4,946,904 | 9,785,484 |
| Dec. 31, 1983 | 5,046,810 | 2,642,440 | 7,689,250 |
| Total | 22,577,585 | 26,759,684 | 49,337,269 |

The November 18, 1994, notice of deficiency reflecting AIC's 1976 through 1978 taxable years contains the following explanation for the above-scheduled adjustments:

Royalty Income-Trade Name

You engaged in transactions with your subsidiaries, Hyatt of Hong Kong, Ltd. (HHK), Hyatt of Singapore, Ltd (HS), and Hyatt of Panama (HP) under which the operating subsidiaries were permitted to use the "Hyatt" trademarks and trade names, to which you held an exclusive license outside the territorial United States. Under section 482 of the Internal Revenue Code and Treasury Regulation section 1.482-2(d), it is determined that an arms'-length royalty equals 1.5% of gross revenues of HHK, HS and HP for each of the years 1976, 1977 and 1978. * * *

Management Fee

It is determined that your attribution of substantially all management fees for the operations and management of foreign Hyatt hotels to Hyatt-Hong Kong, Hyatt-Singapore and Hyatt of Panama, respectively, fails to clearly reflect Hyatt International Corporation (HIC) income for 1976, 1977 and 1978. Pursuant to Internal

Revenue Code section 482 and Treasury regulation
section 1.482(d), it is determined that an arm's-length
charge for management services performed by Hyatt-Hong
Kong, Hyatt-Singapore and Hyatt-Panama equals
$73,200.00 per hotel managed in 1976 through 1978.
* * *

The management fees adjustments generally represent all of the
net income of the named subsidiaries in excess of respondent's
determined per-hotel allowance, less the amount already
determined as trade name royalty.  The February 28, 1995, notice
for AIC's 1979 through 1983 taxable years contained the same
explanations for these adjustments as the November 18, 1994,
notice, except that the per-hotel arm's-length charges determined
by respondent were as follows:

| Year | Amount |
|------|--------|
| 1979 | $75,000 |
| 1980 | 87,500 |
| 1981 | 100,000 |
| 1982 | 62,000 |
| 1983 | 62,000 |

The number of hotels respondent used to compute the fee
adjustments were as follows:

| Year | HHK | HS | HP |
|------|-----|----|----|
| 1976 | 6 | 2 | 1 |
| 1977 | 6 | 2 | 1 |
| 1978 | 7 | 2 | 1 |
| 1979 | 9 | 3 | 1 |
| 1980 | 20 | 3 | 1 |
| 1981 | 28 | 2 | 1 |
| 1982 | 14 | 2 | 1 |
| 1983 | 17 | 2 | 1 |

These numbers were described in the explanation of items as "counts any hotels actually managed by" the respective entity; i.e., HHK, HS, or HP.

## OPINION

### I.  Preliminary Matters--Evidentiary Objections

A.  Documents Executed During or Pertaining to Taxable Years Subsequent to Those in Issue

Respondent objected, on the grounds of relevance, to the admission into evidence of certain documents executed during and/or pertaining to periods subsequent to the taxable years in issue.  Alternatively, respondent objected on the grounds that any probative value of such documents is outweighed by prejudice or considerations of undue delay, waste of time, or the needless presentation of cumulative evidence.  The documents in question primarily include management agreements and financial statements of Hyatt International hotels.

Respondent's objections, in essence, bear more heavily on the probative weight of the documents than on their admissibility.  It is noted that respondent did not object to documents concerning subsequent periods when the documents supported or were helpful to respondent's expert's opinion.

Respondent relies on rules 401, 402, and 403 of the Federal Rules of Evidence.  Under the circumstances here, we hold that the documents to which respondent objected are relevant and

reflect a continuing pattern of activity.  Further, respondent has not shown that the probative value of said documents "is substantially outweighed by the danger of unfair prejudice, confusion of the issues, * * * or by considerations of * * * needless presentation of cumulative evidence."  Fed. R. Evid. 403.

Respondent's objections are overruled, and the exhibits to which respondent objected on relevance and related grounds are part of the record in these cases.

B.  Foreign Language Documents That Have Not Been Translated

Respondent objected to certain foreign language documents for which no English translation had been provided.  Respondent contends that such documents could have no probative value to the trier of fact.  This group of documents consists of financial statements, management agreements, and preopening and technical agreements.  Although the contents of these documents have not been translated, the names of the parties involved and the place and date of execution are discernible.  That information tends to corroborate that the Hyatt International group entered into certain agreements and/or operated certain hotels during the years to which the documents pertain.  In addition, some of the documents containing financial information are readily discernible without the need for translation, but tend to be of less value where the amounts have not been converted into U.S.

dollars.  Here, again, relying on rules 401 and 402 of the Federal Rules of Evidence, respondent's objections appear to go more to the probative weight than the admissibility of these documents.  Therefore, respondent's objections are overruled.

C.  Documents Prepared for Litigation

Respondent objects to certain documents prepared for purposes of this litigation on the grounds that they are hearsay and irrelevant.  These documents consist of materials prepared and supplied to petitioners' expert Ernst & Young LLP (Ernst & Young) to assist in the preparation of its expert report.  The documents in question consist of various summaries of the Hyatt International group data including expenses, sales, guests, and employees.

One of the significant distinctions between expert and fact witnesses is that experts are permitted to rely on evidence outside the trial record.  The evidence outside the record may be hearsay and need not be otherwise admissible, but they may be used by the expert to formulate an opinion.  See Fed. R. Evid. 703.

> Rules 702 and 703 [Fed. R. Evid.] do not, however, permit the admission of materials, relied on by an expert witness, for the truth of the matters they contain if the materials are otherwise inadmissible. See Paddack v. Dave Christensen, Inc., 745 F.2d 1254, 1261-62 (9th Cir. 1984).  Rather, "Rule 703 [Fed. R. Evid.] merely permits such hearsay, or other inadmissible evidence, upon which an expert properly

> relies, to be admitted to explain the basis of the
> expert's opinion."  * * *

Engebretsen, et al. v. Fairchild Aircraft Corp., 21 F.3d 721, 728-729 (6th Cir. 1994).

Accordingly, respondent's objection is sustained in that such documents are not received in evidence for the truth of their contents.  Such documents, however, may be considered for purposes of understanding or explaining the basis for the expert's opinion.

D.  Revenue Agent's and Economists' Reports

Respondent objects to the admission of respondent's in-house economists' reports and international examiner's reports. Respondent points out that these reports were prepared prior to the issuance of the notices of deficiency and, further, that the reports do not represent respondent's final determination.  In the vast majority of cases, we would agree that reports and opinions of respondent's employees prior to the issuance of the deficiency notice are irrelevant to the proceeding.  In cases involving respondent's determinations under section 482, however, taxpayers must establish that the Commissioner's determinations were arbitrary, capricious, or unreasonable.  That burden has often been described as more difficult or heavier (than a mere preponderance of the evidence) to carry.

In cases where we have considered whether there has been an abuse of the Commissioner's discretion, we have occasionally received pre-deficiency notice matter into evidence and looked behind the notice.  See Capitol Fed. Sav. & Loan Association & Sub. v. Commissioner, 96 T.C. 204, 214 (1991); Branerton Corp. v. Commissioner, 64 T.C. 191, 200-201 (1975).  In this case, it is appropriate to include in the record such evidence to enable petitioners to have a fair opportunity to meet their burden. Accordingly, respondent's objection to these exhibits is overruled.

## II.  Factual Overview

These cases present complex factually oriented section 482 reallocation and arm's-length pricing issues.  The parties did not detail, and we have not attempted to detail every aspect of petitioners' operations; i.e., HIC's numerous second- and third-tier subsidiaries, and the myriad individual hotel entities.  We have found the essential and suitable representative facts to explain and identify the entities and their practices and other foundational facts to support our ultimate findings and holdings on the issues.

For trial purposes, the parties have generally focused on the issues without attempting to distinguish one taxable year

from another.[12]  We have followed the parties' lead and addressed the Hyatt International group's patterns of operation as carried out by HIC, HHK, HS, and certain other master hotel management and support services subsidiaries.

The Hyatt International group consists of numerous related companies engaged in the business of hotel management.  Hyatt Domestic's principal shareholders established HIC and started the Hyatt International group operations by hiring an experienced hotelier from the Hilton hotel chain, who in turn hired other experienced individuals, many of whom were also from the Hilton hotel chain.  HIC entered into an agreement with Hyatt Domestic providing for the licensing of the Hyatt trade names and marks to HIC.  Under the agreement, HIC was to pay Hyatt Domestic $10,000 for each Hyatt International hotel that HIC opened.  The Hyatt International group and Hyatt Domestic exchanged reservations and marketing services for their mutual benefit.

The Hyatt International group established separate legal entities for the management of and/or the provision of various services to hotels.  Foremost among the hotel management subsidiaries were HHK and HS.  HESA, another management entity,

---

[12]  Although respondent's deficiency notice determinations utilized different amounts for each year in computing the per-hotel allowances for petitioner AIC's management fee adjustment, for purposes of trial, respondent's methodology no longer relies on differing annual amounts.

was established by means of a joint venture agreement with an unrelated company, VIS, and was owned 49 percent by HIC (Mexico). Service subsidiaries included HCS, a Hong Kong corporation, which provided sales, marketing, and reservation services to all Hyatt International hotels, and IPS, a U.S. corporation, which provided technical assistance, also known as design services.

As a management/services organization, the Hyatt International group's success was heavily dependent on its employees. Initially, the Hyatt International group's size and the volume of hotels managed increased because of employees' efforts in cultivating relationships with hotel owners. In the beginning, staff was hired from other hotel chains and groomed for advancement within the Hyatt International group. As time progressed and the new hotels were opened, expanding the Hyatt group, executive staff could be chosen from within the ranks of Hyatt International hotel personnel.

Executive committees ran each hotel's day-to-day operations. The executive staff at the flagship hotels of the Hyatt Regency Hong Kong and the Hyatt Regency Singapore also concurrently served as area directors and as staff of the master hotel management subsidiaries HHK and HS, respectively. This duplication of responsibilities was thought to lower operating costs. At first, employees received their salaries directly from the hotels. In time, the salaries were paid by HHK or HS for

their area work.  Generally, HHK, HS, HESA, and HIC supervised hotels within their respective geographic regions--i.e., Asia-Pacific, Southeast Asia, Mexico, and Central America, and Europe. Each management subsidiary maintained staff specialists/employees in the functional hotel management areas, including finance, food and beverage, human resources, and clerical.  Unlike management staff working for HHK and HS, HESA and HIC management staff did not have dual roles and did not also serve as hotel staff.

In addition to the direct supervision of particular hotels, HIC provided all of the international group's hotels with certain services.  HIC was involved in coordinating insurance and employee benefits and disseminating training materials.  It also acted as a clearinghouse for the production, maintenance, and distribution of the operations manuals.  HIC staff acted as liaison to outside agencies, such as travel associations and airlines, for the purpose of worldwide marketing.  HIC conducted internal audits, budget and contract reviews, and made staffing recommendations for its subsidiaries.  HIC set the service standards for the Hyatt International group and, along with its master hotel management subsidiaries, monitored the performance of the Hyatt International hotels.

Preopening and operating expenses of hotels were charged to the hotel owners, including:  Hotel staff salaries and benefits; marketing and sales expenses; and office, rooms, and restaurant

expenses. Hotel owners were each apportioned an amount of HCS's expenses that were incurred in connection with the marketing and reservations service. Owners who chose to use the IPS' design services paid IPS a fee for the services. IPS' fees were set based on estimated costs and, for most of the taxable years in issue, IPS' expenses exceeded its revenues. Accordingly, the preopening and operating expenses and IPS fees were not borne by the Hyatt International hotel management subsidiaries. The hotel owners paid management fees directly to the hotel management subsidiaries.

We consider four categories of section 482 income allocations:

(1) Management fee revenues from one subsidiary of the Hyatt International group to another or, most commonly, to HIC, based on respondent's postulation that the latter entity was wholly or partially "responsible for" the management or operation of the hotel that generated management fees;

(2) Royalties from HIC to Hyatt Domestic for the use of the Hyatt trade names, marks, and intangibles;

(3) Royalties from HHK and HS to HIC for the use of the Hyatt trade names and marks; and

(4) Net management income from HHK and HS to HIC for services provided by HIC.[13]

In controversy are Hyatt Domestic's taxable years ending January 31, 1980, through January 31, 1988, and HIC's taxable years ending December 31, 1976, through December 31, 1983.

III.  Section 482--Background

Under section 482, the Commissioner has broad authority to prevent the artificial shifting of income and to allocate income among commonly controlled corporations in order to place them on a parity with uncontrolled, unrelated taxpayers.  See Seagate Tech., Inc., & Consol. Subs. v. Commissioner, 102 T.C. 149, 163 (1994); Sundstrand Corp. v. Commissioner, 96 T.C. 226, 352-353 (1991); see also Bausch & Lomb, Inc. v. Commissioner, 92 T.C. 525, 581 (1989), affd. 933 F.2d 1084 (2d Cir. 1991); Edwards v. Commissioner, 67 T.C. 224, 230 (1976); sec. 1.482-1(b)(1), Income Tax Regs.  A business purpose for an arrangement or a set of transactions does not by itself insulate a taxpayer from a section 482 allocation.  See Sundstrand Corp. v. Commissioner, supra at 353.

---

[13]  In the deficiency notices, respondent determined allocations from Hyatt of Panama to HIC for both trade names and marks and management services.  Respondent's trial position included only allocations from the HHK and HS.  Because respondent no longer relies on or advocates the notice determination on this aspect, we treat respondent's abandonment of the allocations from Hyatt of Panama as a concession of these adjustments.

Section 482 determinations are to be sustained absent a showing that the Commissioner's discretion was abused.  See Paccar, Inc. v. Commissioner, 85 T.C. 754, 787 (1985), affd. 849 F.2d 393 (9th Cir. 1988).  Consequently, taxpayers bear a heavier than normal burden of proving that the Commissioner's section 482 allocations are arbitrary, capricious, or unreasonable.  See Your Host, Inc. v. Commissioner, 489 F.2d 957, 960 (2d Cir. 1973), affg. 58 T.C. 10, 23 (1972); Seagate Tech., Inc. & Consol. Subs. v. Commissioner, supra at 164; G.D. Searle & Co. v. Commissioner, 88 T.C. 252, 359 (1987).  Whether the Commissioner's discretion has been abused is a question of fact.  See American Terrazzo Strip Co. v. Commissioner, 56 T.C. 961, 971 (1971).  In reviewing the reasonableness of the Commissioner's allocation under section 482, we focus on the reasonableness of the result, not the details of the methodology employed.  See Bausch & Lomb, Inc. v. Commissioner, supra at 582; see also Eli Lilly & Co. v. United States, 178 Ct. Cl. 666, 676, 372 F.2d 990, 997 (1967).  The applicable standard is arm's-length dealing between taxpayers unrelated either by ownership or control.  See sec. 1.482-1(b)(1), Income Tax Regs.[14]  Taxpayers bear the burden of showing that the standard they used or that they proposed is arm's

---

[14]  References to the income tax regulations under sec. 482 are to the 1968 regulations as amended and in effect for the tax years under consideration.

length.  See <u>Seagate Tech., Inc., & Consol. Subs. v.</u>
<u>Commissioner</u>, <u>supra</u> at 164.

If it is established that there was an abuse of the
Commissioner's discretion and a taxpayer fails to show that
questioned transactions met an arm's-length standard, then the
Court must decide the amount of an arm's-length allocation.  See
<u>Sundstrand Corp. v. Commissioner</u>, <u>supra</u> at 354.

IV.  <u>Was the Commissioner's Determination Arbitrary, Capricious,</u>
<u>or Unreasonable?</u>

A.  <u>In General</u>

Petitioners argue that respondent has abandoned the grounds
for the determinations in the deficiency notice and, in effect,
conceded that the determinations are arbitrary, capricious, or
unreasonable.  Petitioners also argue that respondent's
determinations were in other respects arbitrary, capricious, and
unreasonable.  Respondent disagrees and contends that no
abandonment of theory or methodology occurred and that the trial
position of respondent is compatible with the determinations in
the deficiency notice.  We consider this portion of the
controversy from two different perspectives.  First, we consider
the effect, if any, of respondent's substitution of different
experts, for trial purposes, from those whose reports were used
for the bases of the determinations in the deficiency notice.
Then, we consider, generally, whether respondent's determination

was an abuse of discretion (arbitrary, capricious, or unreasonable).

B. Substitution of Experts' Opinions

Hyatt Domestic and HIC are subsidiaries of different parent corporations, petitioners HGH and AIC, respectively. Each petitioner filed consolidated Federal income tax returns with its U.S. subsidiaries. In the notices of deficiency, respondent determined that, for the taxable years ending January 31, 1980 through January 31, 1988, the income of Hyatt Domestic should be increased to reflect royalties from HIC for the use of the Hyatt trade names and marks. The amount of the determined royalty was equal to 1.5 percent of the gross revenues of each hotel operated or managed by Hyatt International group. Similarly, respondent also determined that HIC's income for its taxable years ending December 31, 1976 through December 31, 1983, should be increased by the same 1.5 percent of the gross revenues and that amount should be allocated from HIC's subsidiaries.

Respondent also determined that HIC's income should be increased by allocating a certain portion of the management fee income of its subsidiaries (HHK, HS, and HP). The allocated portion was the excess of the amount respondent determined as the arm's-length charge for management services performed by the subsidiary, less the amount that was determined to be a royalty. Respondent calculated arm's-length charges for management

services that respondent allowed on a per-hotel basis times the number of hotels managed.  The determinations of the per-hotel amounts were based on the reports of respondent's prenotice economists, Dr. Joseph Mooney (Dr. Mooney) and David Burt (Mr. Burt).  In addition, respondent determined that the subsidiaries did not manage all of the hotels that remitted fees to them, and, therefore, the number of hotel allowances was limited accordingly.

At trial, the reports of the above-referenced in-house economists were not offered or relied on by respondent.  Instead, respondent relied on Business Valuation Services' (BVS) opinion, in which a profit-split method[15] of determining allocations was utilized to produce an arm's-length royalty for use of the trade names and marks and arm's-length fees for services performed. The total allocations, as recommended in the BVS report, are as follows:

---

[15]  "The profit split approach divides the related parties' combined revenues based on an ad hoc assessment of the contributions of the assets and activities of the commonly controlled enterprises."  Eli Lilly & Co. v. Commissioner, 856 F.2d 855, 871 (7th Cir. 1988), affg. in part, revg. in part on other issues and remanding 84 T.C. 996 (1985).

| Taxable year ending[1] | From HIC to Hyatt Domestic | From HHK/HS to HIC |
|---|---|---|
| Dec. 31, 1976 | $791,103 | $2,164,604 |
| Dec. 31, 1977 | 954,126 | 2,501,906 |
| Dec. 31, 1978 | 1,092,387 | 2,992,556 |
| Dec. 31, 1979 | 1,302,797 | 4,316,952 |
| Dec. 31, 1980 | 1,731,902 | 7,565,475 |
| Dec. 31, 1981 | 1,985,825 | 9,054,035 |
| Dec. 31, 1982 | 1,750,500 | 7,377,525 |
| Dec. 31, 1983 | 1,832,550 | 6,150,778 |
| Dec. 31, 1984 | 1,926,900 | 7,781,600 |
| Dec. 31, 1985 | 1,889,100 | 1,536,910 |
| Dec. 31, 1986 | 2,218,500 | 8,703,363 |
| Dec. 31, 1987 | 2,712,150 | 9,573,138 |
| Dec. 31, 1988 | 3,488,100 | 11,759,205 |
| Total | 23,675,940 | 69,718,842 |

[1]Taxable year is that of HIC/AIC.  Hyatt Domestic/HGH's taxable year ends Jan. 31.

Respondent's notice determinations attributable to the trademarks were as follows:

| Taxable year ending[1] | From HIC to Hyatt Domestic | From HHK/HS to HIC |
|---|---|---|
| 1976 | --- | $982,000 |
| 1977 | --- | 2,048,740 |
| 1978 | --- | 2,296,218 |
| 1979 | --- | 1,877,010 |
| 1980 | $2,159,000 | 3,094,935 |
| 1981 | 3,266,000 | 4,157,250 |
| 1982 | 4,603,000 | 4,838,580 |
| 1983 | 5,279,000 | 5,046,810 |
| 1984 | 5,548,000 | --- |
| 1985 | 6,070,000 | --- |
| 1986 | 5,735,687 | --- |
| 1987 | 5,935,143 | --- |
| 1988 | 7,333,495 | --- |
| Total | 45,929,325 | 24,341,543 |

[1]Hyatt Domestic's fiscal year ends Jan. 31, and HIC was on a Dec. 31 calendar year.

Petitioners argue that respondent has, therefore, abandoned the grounds for the section 482 allocations that were set forth in the notices of deficiency. Petitioners also argue that, by abandoning the deficiency notice grounds, respondent has conceded that the original determinations were arbitrary, capricious, or unreasonable. Respondent counters that the grounds for the allocations have not been abandoned, that the underlying theories are the same, and that the substitution of new expert reports, per se, does not establish that the notice determinations were arbitrary. Respondent also points out that his trial experts' report or opinion was affected by the acquisition of information that was acquired after the issuance of the notice of deficiency and therefore not available to the prenotice experts.[16]

Prior to issuing the deficiency notices, respondent assigned Dr. Mooney the task of analyzing whether and to what extent section 482 allocations of income or deductions are warranted between HIC and certain of its subsidiaries involving the management of foreign hotels. Dr. Mooney prepared a report (Mooney report) dated February 15, 1986, entitled "Economic Evaluation of the Performance of Hyatt of Hong Kong, Ltd." The Mooney report was included as part of the revised International

---

[16] In this regard, no claim is made here that respondent was systematically kept from the information that would have had an effect on the deficiency notice determinations. See, e.g., DHL Corp. v. Commissioner, T.C. Memo. 1998-461.

Examiner's Report for the taxable years 1976 through 1981. The Mooney report served as one of the bases for respondent's deficiency notice determinations (addressed to petitioner AIC) that HIC's income be increased by allocations of income from certain of its subsidiaries.

The Mooney report, for the 1979 through 1981 tax years, credited HIC with the development, implementation, and monitoring of the Hyatt International management system (policies and procedures) and of a set of standards for the operations of its hotels. It contained the statement that "Without these efforts and intangible assets developed by HIC, HHK could not operate as a hotel management firm." In deciding how to allocate income between HHK and HIC, Dr. Mooney also determined a "normal return" amount. He further opined that amounts in excess of his determined "normal return" should be attributed to the intangible assets and services provided by HIC.

To compute the "normal return", Dr. Mooney first reviewed a 1980 study by James J. Eyster (Eyster study) containing the information that chain operators generally require a per-hotel management fee ranging from $65,000 to $120,000. Dr. Mooney, however, relied on two Hyatt International contracts that specified minimum management fees: one dated August 24, 1979, providing for a $75,000 minimum annual fee per hotel in the Philippines, and the other dated April 24, 1981, providing for a

$100,000 annual fee for a Saudi Arabian hotel.  Dr. Mooney, considering these contracts with unrelated parties as the best evidence of a normal return for HHK, set the allowable fees at $75,000 per hotel for 1979, $87,500 for 1980, and $100,000 for 1981.  He recommended that any income above the allowable fees be allocated from HHK to HIC.

Mr. Burt, an industry economist employed by the IRS, was assigned the task of analyzing whether and the extent to which section 482 allocations of income or deductions should be made among and between Hyatt Domestic, HIC, and certain subsidiaries of HIC, attributable to the use of the Hyatt trade names, trademarks, and/or other intangibles.  Mr. Burt prepared two reports that were included as part of the revised International Examiner's Report for the taxable years at issue.  Mr. Burt's reports served as one of the bases for respondent's deficiency notice determinations allocating income from HIC to Hyatt Domestic and from certain subsidiaries of HIC to HIC as a result of the use of the Hyatt trade names, trademarks, and/or other intangibles.

In the first undated report (Burt report one), for the 1979 through 1981 tax years, Mr. Burt opined that 1.5 percent of gross hotel revenue was an arm's-length royalty for the use of the Hyatt trade names and marks.  Mr. Burt's use of the 1.5-percent rate derived from franchise royalties rates charged by four

international hotel chains, as adjusted to eliminate inclusion of advertising or reservations fees.  Mr. Burt located the rates he thought to be comparable in a 1984 publication.  Franchise rates were expressed as a percentage of room revenues; however, available data suggested that room revenues for international hotels were equal to half of total hotel revenues.  The other half was attributable to food and beverage revenues.

Mr. Burt's second report (Burt report two), dated November 11, 1989, covered the 1982 through 1984 tax years.  Mr. Burt had visited hotels in Hong Kong and Singapore during November 1988. He observed that day-to-day operations were conducted under the supervision of the general manager and staff, who made reports to area and/or HIC personnel, but that "every Hyatt [sic] property uses operating policies and procedures originally developed, or modified and adapted, and then implemented by the Chicago-based corporate parent and its staff."  Mr. Burt observed:  "to the extent management is exercised over hotel operations by HHK and/or HS, it usually takes the form of ensuring correct application of, or adherence to, HIC overall corporate philosophy rather than direct management of each hotel's day-to-day operations."  Mr. Burt concluded that each Asian Hyatt International hotel be allowed "remuneration equivalent to that received by an independent (rather than chain) hotel management company", which he suggested was $62,000 per hotel per year, due

to Hyatt International hotels' status as luxury or resort hotels.
Mr. Burt located the $62,000 figure in the same Eyster study used
by Dr. Mooney.  The Eyster study provided information that
independent operators required $24,000 to $62,000 in annual
earnings based on a survey of 29 independent hotel operating
companies.  If fees exceeded $62,000, Mr. Burt advised that the
excess be allocated to HIC.  Mr. Burt also repeated his earlier
opinion that 1.5 percent of hotel gross revenue is an arm's-
length royalty and would have been paid to Hyatt Domestic out of
this excess.

For purposes of trial, however, respondent relied on the BVS
report/opinion.  That opinion was formulated by means of a four-
step process.  First, and prior to determining allocations for
royalties or management services income, BVS reassigned the
management fee income of certain hotels from one subsidiary to
another or to HIC based on BVS' perceptions of the roles played
in developing the contract or in managing the hotel.  Second, BVS
employed a royalty equal to 15 percent of HIC's revenues
(calculated after adjustments for all of the other types of
allocations) due from HIC to Hyatt Domestic.  The resulting
figure was thought to represent a profit split between HIC and
Hyatt Domestic.  The split was intended to account for Hyatt
Domestic's contribution of its investment in chain services and
its position as the originator of the Hyatt trade name and marks

and the Hyatt International group's contribution of capital and personnel. Third, BVS employed a royalty equal to 33 percent[17] of management fees (after the first above-described adjustment) that was to be allocated from HHK and HS to HIC. This royalty is for trade names and marks and to "provide a profit for the reservations activities, cover corporate overhead and subsidize the development activities." In addition, the royalty from HHK and HS was also intended to fund or pass on the cost of the royalties that would be due from HIC to Hyatt Domestic. Fourth, BVS concluded there should be an allocation from HHK and HS to HIC, described as a profit split, of generally 50 or 65 percent (depending on the year) of the operating income remaining after expenses and the above royalties are deducted. BVS intended the profit split to cover the financial guaranties and differences in assets, with HIC being considered the owner of the intangibles and the financial capital.

In deciding whether the Commissioner's determination is reasonable, courts focus on the reasonableness of the result, not on the details of the methodology used. See Seagate Tech., Inc., & Consol. Subs. v. Commissioner, 102 T.C. at 164. In a particular case, the Commissioner's deficiency notice

---

[17] It was contended that the 33 percent of the management fee rate was the equivalent of 1 percent of gross hotel revenues in comparison to Mr. Burt's 1.5 percent rate.

determination was based upon one method and an amendment to answer contained another method that resulted in an increased deficiency from that determined in the deficiency notice. See Eli Lilly & Co. v. Commissioner, 84 T.C. 996, 1132 (1985), affd. in part, revd. in part on other issues and remanded 856 F.2d 855 (7th Cir. 1988). The Commissioner's trial expert in that case did not opine about either of these methods and, instead, relied on two other methods to allocate income. The taxpayer in Eli Lilly & Co., similarly to petitioners here, argued that the difference between the trial position and the deficiency notice determinations caused the Commissioner's determinations to be arbitrary, capricious, and unreasonable. As a result, the taxpayer contended that the Commissioner's determination should not be entitled to the presumption of correctness. The Court disagreed, holding that the presumption of correctness afforded to the Commissioner's section 482 determinations is not to be lost solely because of the use of differing methodologies. The Court reasoned that to hold otherwise would preclude the Commissioner from using outside experts or making alternative determinations. In some circumstances, however, an abandonment of methodology may support a finding in part or whole, that the Commissioner's determination was unreasonable, arbitrary, or capricious. See, e.g., National Semiconductor Corp. v. Commissioner, T.C. Memo. 1994-195.

Under the circumstances of this case, respondent's substitution or change of methodology, alone, does not result in our finding or holding that respondent's determinations are arbitrary, capricious, or unreasonable. There were certain similarities in the approaches and methodologies used to formulate respondent's deficiency notice and those used by respondent's trial experts.

C. Is Respondent's Determination in Other Respects Arbitrary, Capricious, and Unreasonable?

Background

Next, we consider petitioners' contentions that respondent's determinations were, considering all the circumstances, an abuse of respondent's discretion. It appears that a primary basis for respondent's section 482 deficiency notice allocations was the belief that HIC bore the majority of the consolidated expenses of the Hyatt International group and that HHK and HS received the majority of the revenue. Respondent compared petitioners' profitability ratios to those of other hotel companies. In that regard, the Hyatt International group's accounting system does not include expenses paid by the owner, whereas other hotel companies that respondent treated as comparable, used combinations of franchise, lease, and management contracts.

Another variable here is that HIC acted as both management entity and parent (individually), so that some of its expenses were related to its activity as a parent company.  In addition, HIC incurred expenses with respect to its involvement with hotels in Brussels and Nice.  Respondent's experts generally did not recognize the contributions made by HHK and HS, because their efforts were not evidenced by expenditures recorded on those management subsidiaries' books.  On those occasions where the efforts of HHK and HS personnel were recognized, respondent's experts considered them to be performed on HIC's behalf.  We now consider, in particular, whether any of respondent's determinations were arbitrary, capricious, or unreasonable.

1.  Allocations Between HIC and Hyatt Domestic

HIC and Hyatt Domestic entered into a 1974 agreement for the purpose of sharing the services of each other's sales offices. HIC billed Hyatt Domestic for a contractually agreed level of support from the Hyatt International sales offices.  Hyatt Domestic included these costs as part of its chain expenses and billed each of its hotels and those of the Hyatt International group for a share of the overall chain expenses.  The chain allocation formula was based on the number of guest rooms.  In accordance with the 1974 chain services sharing agreement, Hyatt International hotels paid either 50, 75, or 100 percent of a full chain allocation depending on the hotel's geographical location.

This approach was used because it was thought that a hotel's geographical distance from Hyatt Domestic's U.S. sales offices would affect the benefits; i.e., the greater the distance, the less the benefit. Respondent, however, concluded that the possibility for tax avoidance was lurking in these circumstances under which many hotels were being charged less than an equally apportioned share of the chain service allocation. The use of total rooms per hotel adjusted for the distance of a hotel from the U.S. sales offices, to some extent, appears to reasonably account for the circumstances.

Beginning February 1, 1980, cross-billing and reimbursement were discontinued under the assumption that the benefits exchanged were equal, although both organizations continued to share chain services. Both Hyatt Domestic and the Hyatt International group invested in establishing chain services and made a business decision to share those services. To the extent that they exchanged services of equal value, we hold that no allocation between HIC and Hyatt Domestic is warranted. To the extent that respondent's determinations included allocations of income between Hyatt Domestic and HIC for chain services it was an abuse of discretion. We note that any income allocation between HIC and Hyatt Domestic would have been made under the 1.5 percent royalty adjustment.

Respondent, in making the deficiency notice allocations, relied on the fact that Hyatt International group hired staff trained by Hyatt Domestic. Due to differences in their respective operations, however, HIC did not gain by hiring Hyatt-Domestic trained staff rather than experienced staff from other similarly situated hotels. In other respects, the record does not support a finding that the Hyatt International group received anything else for which compensation would have been due to Hyatt Domestic; e.g., training programs, innovative atrium and restaurant designs, or manuals. In addition none of the parties' trial experts focused on these specific items. Accordingly, we find that respondent's determination with respect to these items is arbitrary, capricious, and unreasonable.

2. Notice Determinations for Hyatt Domestic's Income Allocations Attributable to Royalties for Trade Names and Marks

For each of Hyatt Domestic's taxable years, respondent determined that 1.5 percent of the gross receipts each hotel operated in the Hyatt International group be allocated to Hyatt Domestic. Two of the notices contain explanations that the adjustment is a royalty for the use of Hyatt trademarks and other intangibles. One notice (for 1983, 1984, and 1985 taxable years) contains the 1.5 percent adjustment, but states that it for use of the trademark, without any reference to other intangibles. For purposes of trial, respondent's expert concluded that a

royalty of 15 percent of the net revenues should be allocated to Hyatt Domestic.  Respondent's expert concluded that the royalty was an equivalent of a profit split accounting for HIC's capital and personnel to build an international chain and Hyatt Domestic contributing chain services and its intangibles, including the trademarks.

The 1974 licensing agreement between HIC and Hyatt Domestic was for the use of the various Hyatt trade names and marks.  HIC agreed:  To pay Hyatt Domestic a one-time payment of $10,000 per hotel opened; to pay the costs of registering the trade names and marks; and that the standards of services and the quality of products bearing a mark would, at very least, be equivalent to those adopted or maintained by Hyatt Domestic.  For $10,000 per hotel, HIC received a license to use Hyatt trade names and marks in perpetuity from Hyatt Domestic.  Beyond that, however, the Hyatt International group received relatively nominal amounts of chain services from Hyatt Domestic in excess of services provided for Hyatt Domestic.

Respondent's deficiency notice determination that Hyatt Domestic and HIC's income be increased by a royalty of 1.5 percent of the gross hotel revenues of the Hyatt International group[18] was based on hotel franchise rates.  Respondent's

---

[18]  The amount of royalty determined to be included in HIC's
(continued...)

prenotice expert adjusted these franchise rates to make them exclusive of marketing and reservation charges, and ultimately we have decided that the franchise rates respondent used in the notice were overstated.  A franchisee, in exchange for a royalty, receives trade names and marks, business systems and expertise, and for additional fees may receive reservations and marketing services.[19]  Hotel franchisors generally offer preopening assistance with site selection and feasibility, design, obtaining financing, and the hiring and training of staff.  The consultation and technical services and training provided by the franchisor continue after the opening of the hotel.  Neither HIC nor the Hyatt International group as a whole, received the level of intangibles and services from Hyatt Domestic that would warrant the full charge for a franchise relationship.  Considering the relationship between the Hyatt International group and Hyatt Domestic, it was unreasonable for respondent to allocate income based on 100 percent of the hotel franchise royalty rate.

Respondent's trial position relied on the BVS' allocation of less than $24 million for use of the Hyatt trade names and marks

[18](...continued)
income would, in turn, be paid by HIC to Hyatt Domestic.

[19]  See Canterbury v. Commissioner, 99 T.C. 223 (1992), for a description of franchising in the restaurant industry.

for Hyatt Domestic's 9 taxable years.  This contrasts with the nearly $46 million 9-year total set forth in the deficiency notices.  Respondent's trial position represents less than 40 percent of the original deficiency notice determinations.  Those factors, coupled with the change of methodology and experts supports our holding that respondent's deficiency notice determinations for the Hyatt trade names and marks were unreasonable and an abuse of discretion as to respondent's determinations regarding royalty allocation to Hyatt Domestic. See National Semiconductor Corp. v. Commissioner, T.C. Memo. 1994-195.

### 3.  Allocations to HIC from Its Subsidiaries

We next consider whether there was an abuse of discretion in respondent's royalty income allocations to HIC for its subsidiaries' use of the Hyatt trade names or marks.  HIC did not receive any portion of the management fee income from the hotels as operating revenue.[20]  Beyond expenses related to chain services that were charged to the hotels through HCS, HIC did not charge its subsidiaries for services provided.  During 1983, however, there was a one-time "catch-up" charge on HHK's books for HIC's overhead expenses from prior years.

---

[20]  HIC did, however, receive dividends from HHK and HS.

Respondent's adjustments to HIC's income involve three types of allocations:  (1) Royalty to HIC for its subsidiaries' use of trade names and marks, (2) allocation to HIC of its subsidiaries' management fee revenues, and (3) allocation of management income to reflect HIC's relative contribution vis-a-vis the subsidiary in operating the individual hotels.  Respondent's royalty income allocations for trade names and marks from HIC's subsidiaries to HIC are based on the same reasoning and were at the same percentage as allocated from HIC to Hyatt Domestic.  Our reasoning for the Hyatt Domestic/HIC royalty allocation also applies to HIC and its subsidiaries.  Accordingly, we hold that respondent's determinations involving royalty income allocations to HIC from its subsidiaries were an abuse of discretion.

Respondent also determined that the management fee income reported by HHK, HS, and HP above a "normal return" per hotel, should be allocated to HIC.  In computing the subsidiary income allowed, only those hotels respondent determined to be actually managed by the respective subsidiary received an allowance.  Accordingly, some portion of the allocations represented income from HIC's subsidiaries with respect to those hotels that respondent decided were not managed by the subsidiary.  Due to respondent's selectivity and the use of average allowances rather than actual hotel revenues, there is no way accurately to

ascertain the portion of the adjustment for hotels not managed from the "excess" income attributable to those respondent determined were actually managed.  After computing the total income to be allocated from the subsidiaries, respondent subtracted the royalty for the use of the trade names and marks to arrive at the amount allocated for services.

In the reports that predated the deficiency notice, Mr. Burt and Dr. Mooney opined that the amount earned by a hotel in excess of the "normal return" was allocated to HIC in recognition of HIC's contribution of intangibles and services.  The theory advanced for those allocations was that the excess over a "normal return" was due to the benefit and advantages of being a part of the chain, which were contributed by HIC.  In establishing a "normal return", both Mr. Burt and Dr. Mooney used amounts reported by others as the minimum acceptable earnings.  One used the independent hotel operator figure of $62,000, and the other considered the chain operator's figures ranging from $65,000 to $120,000, but ultimately used the amounts reflected in two Hyatt International contracts.  Mr. Burt used $62,000 for the years 1982 and 1983 (the latest years in issue) and increasing amounts ranging from $73,200 for 1976 to $100,000 for 1980.  The use of the $62,000 figure resulted in losses for the subsidiaries. There was no apparent consideration of the sizes or locations of the hotels used in the Eyster study, or of the hotels involved in

the Hyatt International contracts, relied upon by Dr. Mooney and Mr. Burt.  Mr. Burt and Dr. Mooney did not give consideration to the role played by HHK or HS in the development, implementation, and monitoring of the Hyatt International group policies and standards or in otherwise enhancing the performance of the hotels they supervised.

Overall, by means of the deficiency notices, respondent determined $49,337,269 of allocations attributable to HIC. Comparatively, BVS's opinion recommends just over $30 million attributable to HIC.  BVS analyzed the relationship between HIC and its management subsidiaries and concluded that a profit-split methodology should be used in constructing its recommendations. Petitioners' expert, Ernst & Young, concluded that management fees were earned by the subsidiary that received them.  Because of the approximate $2.5 million catchup overhead charge in 1983, they recommended that no allocations were needed for support services from HIC.  Ernst & Young also concluded that allocations were unnecessary for IPS's services, due to its limited influence in the years involved, or for chain services, as costs were covered and any profit on chain services should accrue to HCS, a subsidiary of HHK.

Ultimately, we hold that HHK and HS received the benefit of certain services from HIC (as discussed infra) and that allocation of income is necessary.  The reports, prior to the

issuances of the deficiency notices, were confronted with a compelling financial picture.  For 1976 Hyatt's domestic (including HIC) operations reflected revenues somewhat over $1.5 million with expenses somewhat over $2.5 million, whereas the amounts reflected for foreign operations income approached $4.5 million with expenses approaching $.5 million.  Accordingly domestic operations had almost a $1 million loss and foreign operations had almost a $4 million gain.  These differences increased throughout the period, and in the 1982 year domestic operations had about $2.5 million income and $8.5 million expenses for about a $6 million loss.  The foreign operations, for 1982, had about $13.5 million income and $3.3 million expenses for about a $10 million gain.  Roughly, domestic operation expenses averaged about double the amount of receipts and foreign operation expenses were only about 50 percent of their receipts.

During the period under consideration, the foreign operation receipts and profit was, in general, steadily increasing.  During that same period, the domestic operation expenses were steadily increasing in tandem with foreign receipts and profit, but domestic receipts tended to be more static.  These circumstances resulted in generally increasing losses for domestic operations and generally increasing gains for foreign operations.  Throughout the period, HIC was involved in the management of its

subsidiaries and in the overall management of the Hyatt International group.  Significantly, to the extent that services were charged, they were at cost.  Under that combination of circumstances these financial trends appear to be incongruent. Confronted with that information and data gathered from other hotel chains, respondent's employees' evaluations and, ultimately, respondent's determinations were based on reasonable assumptions and fell within reasonable limits.  After trial, we were able to discern nuances and differences in petitioners' operations that caused us not to sustain fully respondent's notice or trial positions; however, we generally did not accept petitioners' reporting or trial positions either.

Accordingly, we do not find respondent's determination with respect to these allocations to be arbitrary, capricious, or unreasonable.

Having decided that some of respondent's determinations were arbitrary and capricious, petitioners are left with the burden of showing that the amounts in question were for an arm's-length consideration.  If petitioners fail to show that their transactions met the arm's-length standard, then we must decide the appropriate consideration; i.e., an arm's-length rate between unrelated parties.  Concerning the remainder of respondent's

section 482 determinations, petitioners must show an abuse of respondent's discretion.[21]

V.  Arm's-Length Consideration

    A.  Respondent's Allocations of Management Fee Revenue for HHK, HS, and HIC

HHK and HS received management fee revenue from hotels for which HHK or HS did not provide services.  In this regard, petitioners acknowledge that HIC was responsible for European and Central American hotels throughout the years in issue (1976 through 1983).  Accordingly, we sustain respondent's allocation of income for these hotels to HIC.[22]

HHK received consulting fees and royalties from HESA without performing services for HESA or the Mexican hotels.  HESA managed the hotels in Mexico and earned the management fees, and the consulting agreement was merely a mechanism to reduce local

---

[21] In the final analysis, it did not make a difference that petitioner was unable to show that all of respondent's determinations were arbitrary, capricious, or unreasonable.  That is so because, in those instances where we redetermined an arm's-length consideration, petitioners were not able to meet the lesser standard of showing that their reporting or trial position was for an arm's-length consideration.

[22] BVS recommended allocation of revenue from certain hotels in the Middle East and North Africa.  These particular hotels were not in operation during the years affecting the allocations to HIC (1976 through 1983), and allocation in the later years that involve only Hyatt Domestic's allocations (through 1988) would not change the result because, ultimately, the royalties were computed as a percentage of gross hotel revenues rather than being based on HIC's revenues.  Thus, it is not necessary to analyze the particulars of hotels managed in those regions.

taxes. Regardless of whether the income is HESA's or HHK's, it is not HIC's income.[23] See Columbian Rope v. Commissioner, 42 T.C. 800, 812-813 (1964). Accordingly, respondent's allocation concerning the Mexican hotels is an abuse of discretion and is not sustained.

BVS opined that the revenue for the Hyatt Kingsgate Sydney should be allocated from HS to HHK. Due to favorable tax treaties, the Hyatt Kingsgate Sydney's fees were assigned to HS, although the hotel was supervised by HHK. While this allocation may have been part of the BVS profit-split analysis, it has no impact on and is neutralized by our holdings concerning HIC's income. See National Semiconductor Corp. v. Commissioner, supra.

In addition to those hotels for which BVS recommended 100-percent revenue allocation, smaller percentages were recommended where some other entity was the contract source or provided some small service. This appears to be a new matter that was not addressed in the deficiency notices. The parties' broad-based approaches failed to address the specific details concerning each hotel involved in these smaller allocations. Irrespective of the parties' approach, allocations from one to another foreign entity would not directly or adversely affect HIC's U.S. income. As for

---

[23] HIC (Mexico) was, at that time, a 49-percent owner of HESA. Any amount that would be paid from HESA as dividend income to HIC (Mexico), a U.S. subsidiary of HIC, would be included in the U.S. consolidated return with HIC.

those allocations that involve HIC, as discussed <u>infra</u>, we find that the business development type activity constituted HIC's activity as a parent company. Accordingly, these allocations either are not in issue or have no effect on the outcome.

B. <u>Royalties Allocated to Hyatt Domestic for HIC's Use of the Hyatt Trade Names and Marks and Other Intangibles</u>

Hyatt Domestic, beginning in 1968, provided HIC with a license to use the Hyatt trade names and marks. In its 1980 taxable year, Hyatt Domestic provided more chain services to the Hyatt International hotels than Hyatt Domestic had received. Respondent, relying on the BVS report, contends that a 15-percent royalty should be allocated from HIC to Hyatt Domestic based on HIC's revenues. The proposed allocation, according to respondent, represents a profit split between HIC and Hyatt Domestic reflecting Hyatt Domestic's contribution of its investment in chain services, Hyatt Domestic's originator status regarding the Hyatt trade name and marks, and HIC's contribution of capital and personnel.

Petitioners, relying on the Mercer Management Consulting (Mercer) report, contend that the Hyatt name had little or no value and did not increase the Hyatt International group's income-generating capability. The parties and their experts did not focus on the specific factors that might influence the amounts or the operation of the royalties. Instead, in a broad-

brushed manner, each side generally sought to convince us that there should or should not be a royalty allocation. In that setting, we undertake our analysis of the value of royalties attributable to the names and marks.

In a recent Memorandum Opinion of this Court, a trademark was described as:

> a marketplace device by which consumers identify goods and services and their source. In the context of trademark nomenclature, a trademark symbolizes "goodwill" or the likelihood that consumers will make future purchases of the same goods and services. In a licensing arrangement, the goodwill symbolized by the trademark is owned by the licensor, even though created by the licensee's efforts. See, e.g., Cotton Ginny, Ltd. v. Cotton Gin, Inc., 691 F. Supp. 1347 (S.D. Fla. 1988).

DHL Corp. v. Commissioner, T.C. Memo. 1998-461.

In another Memorandum Opinion, it was explained that:

> Trademark recognition develops from years of advertising, consistent packaging, promotional campaigns, customer service, and quality control. Depending on the strength of a trademark, the maintenance of the desired consumer awareness level generally requires significant, continuing advertising investment and product renovation. Trademarks lose substantial value without adequate investment, management, marketing, advertising, and sales organization.

Nestle Holdings, Inc. v. Commissioner, T.C. Memo. 1995-441, revd. and remanded on other grounds 152 F.3d 83 (2d Cir. 1998).

Petitioners' expert (Mercer) found little evidence of any value of the Hyatt trade names and marks when used by Hyatt International hotels. This conclusion was based on Mercer's

postulations: that, generally, brand name is a less significant factor to hotel guests than location; chain hotels constitute a much smaller percentage of the international market than that of the U.S. hotel market; smaller hotel chains have lower brand awareness; there was no premium paid for Hyatt International hotel rooms over competitors' rooms; there was a small number of guests from the United States (who would be familiar with the Hyatt name) traveling to the Asia-Pacific area where most Hyatt International hotels were located; the percentage of U.S. guests in most Hyatt International hotels was below market average; and the Hyatt International group management fees were lower than average.

We do not accept the Mercer conclusion that the Hyatt name has no value in the context of international operations. Hotel location may be an important or possibly even a primary factor in a guest's hotel selection; however, it has been shown that brand name is an important factor in attracting certain categories of guests. BVS found that trade names are important for incremental business, even where most of the reservations were secured through local contacts. Petitioners argued that Hyatt International hotels earned no premium on the rates they charged as compared to other competing hotels. Hyatt International hotels, however, competed favorably with luxury hotels, including those run by Hilton International, reflecting that the Hyatt

brand was valuable and, to some extent, was a drawing factor for potential customers. The affiliation with a major chain also has a beneficial effect on Hyatt hotel owners' attempts to secure financing. Petitioners' experts minimized and attempted to play down the fact that some Hyatt International hotel guests were from the United States.[24] Hyatt Domestic's promotion of the Hyatt name and referral of guests to Hyatt International contributed some value to the Hyatt trade names and marks to Hyatt International, especially when viewed 10 years out and later.[25] Overall, we disagree with petitioners and hold that the Hyatt trade names and marks had some importance or value to the Hyatt International group.

In the event that we might decide the Hyatt names and marks had value, petitioners advanced the alternative argument that the Hyatt International group's use of the names and marks represents the arm's-length consideration and provides reciprocal benefits to Hyatt Domestic. While it is possible that a similar benefit

---

[24] As would be expected, the percentage varied from location to location, particularly in Mexico, Puerto Rico, and Central America.

[25] We reiterate that $10,000 was paid for each hotel without regard for the time value of money or the passage of time. As of the years under consideration, when the number of hotels had increased and the name use and recognition must have increased, the $10,000 was the standard, unchanged from 1968. In 1975 there were 19 hotels, and by 1988 about 40 (without considering those in Mexico). From 1975 to 1988 HIC's gross management revenue increased fivefold.

could have enured from Hyatt International's use of the name (i.e., where guests staying at Hyatt Domestic hotels were familiar with Hyatt International hotels), petitioners have presented no evidence, one way or the other, on the origin of guests staying at Hyatt Domestic hotels or any other measure of any such benefit from the Hyatt International group's operations to Hyatt Domestic.[26]  As a second alternative, petitioners argue that the Hyatt International group assisted in the development of the trade names and is entitled to a setoff for that under section 1.482-2(d)(1)(ii)(b), Income Tax Regs.  Petitioners, however, have presented no evidence of the costs or outlays that may have been incurred in order to measure and reach such a determination.  See sec. 1.482-2(d)(1)(ii)(c), Income Tax Regs.

Respondent relies on the fact that Hyatt Domestic initiated lawsuits to protect its trade name.  Respondent argued that such action is evidence that the Hyatt name had great value.  Instituting suits, however, does not automatically reflect that the name or mark has great value.  Such suits may be brought to protect marginal values, because failure to act against infringements could lead to loss of the trade name protection.

_____

[26]  Nor did petitioners present evidence showing that the $10,000 amount per hotel provided for in the licensing agreement was an arm's-length consideration within the meaning of sec. 1.482-2(d)(2), Income Tax Regs.

Winget Kickernick Co. v. La Mode Garment Co., 42 F.2d 513, 514
(N.D. Ill. 1930).

Having held that the Hyatt trade names and marks do have
value in the context of the international operations, we now turn
to evaluating the amount of arm's-length consideration that
should have passed from HIC to Hyatt Domestic for the use of the
Hyatt names and marks.  The parties placed heavy reliance on
their respective expert witnesses in arguing what is the correct
amount of arm's-length consideration for use of the names and
marks.  In reaching our holding:

> We weigh expert testimony in light of the expert's
> qualifications as well as all the other credible
> evidence in the record.  Estate of Newhouse v.
> Commissioner, 94 T.C. 193, 217 (1990).  We are not
> bound by the opinion of any expert witness, and we will
> accept or reject that expert testimony when, in our
> best judgment, based on the record, it is appropriate
> to do so.  Estate of Newhouse v. Commissioner, supra;
> Chiu v. Commissioner, 84 T.C. 722, 734 (1985).  While
> we may choose to accept the opinion of one expert in
> its entirety, Buffalo Tool & Die Mfg. Co. v.
> Commissioner, 74 T.C. 441, 452 (1980), we may also be
> selective in the use of any portion of that opinion.
> Parker v. Commissioner, 86 T.C. 547, 562 (1986).

Sundstrand Corp. v. Commissioner, 96 T.C. at 359.  A review of
the royalty, marketing, and reservations charges of U.S.-based
hotel franchises by respondent's expert (BVS) resulted in
combined average rates ranging from 3 to 7 percent of gross room
revenue.  Generally, as a percentage of gross room revenues,
royalties ranged from 4 to 5 percent, typical marketing fees

ranged from 1 to 3 percent, and reservations fees ranged from 1 to 2 percent.  Finding no completely comparable transaction, BVS used the royalty of 1 percent of gross hotel revenue that HESA paid HHK.  BVS then calculated that 15 percent of HIC's net adjusted revenues (after all other allocations) approximated the 1 percent of gross hotel income HESA paid as a royalty.  That amount and most of respondent's notice determinations included within the royalty the use of the trademarks/trade names and other intangibles.

The original HESA agreement provided for royalties of 2 percent of hotel gross income within the context of a consulting fee in the amount of 75 percent of HESA's management fee revenue. As more hotels were added to the venture, royalties were reduced to 1 percent.  Although petitioners have put their spin on the reasons for the rate reduction, it is not entirely clear why BVS chose the 1-percent, rather than the 2-percent, rate.  The HESA royalty included use of the trade names and marks and all Hyatt chain services.  We note that Hyatt Domestic licensed the use of its names and marks but provided only a portion of the Hyatt International group's chain services, and the latter was, to some extent, balanced by the Hyatt International group's reciprocation of similar services.

Importantly, the HESA agreements reflect a relationship that is quite different from the relationship between Hyatt Domestic

and HIC. The HESA royalty agreement was part of a group of simultaneously executed contracts establishing a joint venture relationship between HIC and VIS. We also note that although 15 percent of HIC's adjusted net revenues, as calculated by BVS, might have been equivalent to 1 percent of hotel gross income, we do not accept all of the management fee allocations BVS made, and therefore the use of BVS's 15-percent equivalence does not have adequate support in the record.

With the parties going off in opposite directions and reaching diametrically opposed positions, neither of which is wholly supportable, we do not place complete reliance on either party's expert. Petitioners' expert denies any but a de minimis value, a position we have rejected. In that same vein, we have found respondent's expert's premises to be only partially acceptable.

Section 1.482-2(d), Income Tax Regs., provides a framework for determining an arm's-length consideration for the transfer, sale, assignment, loan, or other use of intangible property or an interest therein between related entities. An arm's-length consideration for intangible property is defined as "the amount that would have been paid by an unrelated party for the same intangible property under the same circumstances." Sec. 1.482-2(d)(2)(ii), Income Tax Regs. The best indication of such arm's-length consideration generally is the amount of consideration

paid for transfers by the same transferor to unrelated parties involving the same or similar intangible property under the same or similar circumstances. See id. If no sufficiently similar transfers can be found, section 1.482-2(d)(2)(iii), Income Tax Regs., sets forth a list of factors that may be considered in arriving at the amount of the arm's-length consideration. The arm's-length nature of an agreement is determined by reference only to facts in existence at the time of the agreement. See Bausch & Lomb, Inc. v. Commissioner, 92 T.C. 525, 601 (1989), affd. 933 F.2d 1084 (2d Cir. 1991).

No evidence of similar intangibles being transferred to an unrelated party was produced. Hyatt Domestic's transaction with HIC and HIC's with its subsidiaries concerned services and other aspects, in addition to the names and marks. In each instance, the names and marks were part of a larger package including the provision of various services. Accordingly, we utilize the factors specified in section 1.482-2(d)(2)(iii), Income Tax Regs., to formulate our holding, noting that the parties' experts have not specifically addressed those factors.

One significant factor to consider would be the prevailing rates in the industry. Ideally, the 1968 rates for trade names and marks in the hotel industry would be a starting point. The hotel franchise rates presented in the record, however, cover the period 1979 through 1988. The licensing agreement here was

granted in perpetuity in exchange for a $10,000 flat fee payable for each new hotel. The terms of the licensing agreement do not include a consideration of time factors, such as the amount of time the hotel was to be operated. The license transferred was for exclusive use outside the United States. The Hyatt International group was required to pay for the registration of the trade names and marks in the countries of its operation, a factor that may be considered. See sec. 1.482-2(d)(2)(iii), Income Tax Regs.

Petitioners dispute the appropriateness of the use of comparables based on franchise rates principally because the Hyatt International group operated under management agreements, not franchise agreements. Although a franchise analogy does not present a completely suitable comparison with the existing relationship between the Hyatt International group and the hotel owners, a franchise analogy does more accurately fit the relationship between HIC and its hotel management subsidiaries. A franchise relationship normally includes a license to use the franchisor's name and marks. That type of license was provided by Hyatt Domestic to HIC, which in turn provided it to HIC's subsidiaries. Franchise rates, however, normally include much more than the rights or licenses transferred by Hyatt Domestic; e.g., providing business systems and expertise and providing reservations, marketing, and technical services. Thus, we must

separate the value attributable to trade names and marks from the other items normally included in a franchise rate or agreement.

The parties' experts appear to agree that the franchise rates for luxury hotels charged by U.S.-based hotel chains were the equivalent of about 2 percent of gross hotel revenue.[27]  In determining the arm's-length charge for the Hyatt trade names and marks, we begin with a franchise rate of 2 percent of gross hotel revenues.  The Mercer report included a presentation of Hilton franchise revenue and expenses from 1987 through 1990.  Approximately one-half of the Hilton franchise revenues were used for expenses, exclusive of taxes.  If approximately one-half of franchise revenues represent expenses, the other half, or 1 percent of gross hotel revenues, remains for allocation to profit on reservations, marketing, expertise, and other services, as well as a royalty for trade names and marks.  Of the 1 percent representing profit, we attribute .5 percent to royalties and .5 percent to other items.

Based on the information available, we hold that the appropriate arm's-length charge for the Hyatt trade names and marks and the chain services provided by Hyatt Domestic is two-

---

[27]  Accepting the premise that room revenues and food revenues each comprise, on average, half of an international hotel's gross revenue, a franchise rate of 4 percent of room revenues translates to a rate of 2 percent of hotel gross revenues.

fifths of 1 percent (.4 percent) of the gross revenue of each
Hyatt International hotel.[28]  The .4 percent franchise rate, in
addition to accounting for an approximate division of the
elements in the franchise rate including use of the marks and
other intangibles, favors petitioners' position in one important
respect.  In particular, our allocation or reduction of the
franchise rate recognizes, to some extent, that marks and names
are less important in the international hotel marketplace.

C.  Allocations of Royalty Income for Trade Names and Marks
to HIC From Its Subsidiaries

HIC's subsidiaries did not pay HIC royalties for the use of
the Hyatt trade names and marks.  In the notices of deficiency,
respondent determined that HIC's income should be increased for
royalties from HHK, HS, and HP of 1.5 percent of their gross
revenues, the same rate as respondent's determined royalties from
HIC to Hyatt Domestic.  At trial, respondent relied on the BVS
recommendation that a royalty of 33 percent of management fees,
as adjusted, should be allocated from HHK and HS to HIC.  The
proposed royalty is to account for trade names and marks and to
"provide a profit for the reservations activities, cover
corporate overhead and subsidize the development activities."  It

_____

[28]  The royalty allocations should be offset by the $10,000
per hotel license fees that HIC paid to Hyatt Domestic during the
years in issue.

also was intended to cover the cost of royalties from HIC to Hyatt Domestic.

Mirroring their argument with respect to respondent's royalty determination between HIC and Hyatt Domestic, petitioners argue that these intangibles have no value, or that it was the subsidiaries (HHK and HS) that created the value. In this setting, however, petitioners also rely on Your Host, Inc. v. Commissioner, 58 T.C. 10, 27-28 (1972), affd. on other issues 489 F.2d 957 (2d Cir. 1973), for the proposition that, even in a chain operation, a trade name may have little value.

Your Host, Inc. v. Commissioner, supra, involved 11 restaurant corporations with common ownership and senior management that operated a total of 40 restaurants with the name of Your Host Restaurant. All but three of the restaurants were located in the Buffalo, New York, area, with the remainder in Rochester, New York. Two of the three Rochester restaurants closed after 6 years. All of the restaurants were similar in appearance, served identical menus at the same prices, and were open 24 hours a day. They advertised as being part of a chain under the same management. For economy of scale, a master policy for liability insurance and workmen's compensation was obtained for all the corporations. The premium for the coverage was advanced by Your Host corporation and was reimbursed by the other corporations in apportioned amounts based on each corporation's

payroll. All employees were paid from a special payroll account maintained by the Your Host corporation. The individual corporate entities would deposit the funds needed to pay the net wages of their respective employees and then Your Host corporation paid out the wages, leaving a zero balance in the payroll account. Each restaurant had a manager; however, the manager could not change the menu or hours of business, nor purchase supplies from other than the related supplier. The costs of the administrative staff, insurance premiums, administrative office expenses, advertising, and maintenance and supervisory staff generally were allocated among the corporations according to gross sales, except the Rochester corporation did not share in advertising costs because its restaurants did not benefit from Buffalo area advertisements. The Commissioner allocated all of the income and deductions of all 11 corporations to the Your Host corporation pursuant to section 482.

In Your Host, Inc. v. Commissioner, supra, we held that each of the corporations was a viable business entity that paid its own expenses. Although the restaurants opened over a 25-year period, with the openings of the first restaurant for each corporation over a 13-year period, we found that the restaurants operated by the Your Host corporation were, on average, no older and no better established than those operated by the other corporations. Thus, the later-established restaurants were not

found to have traded upon the goodwill generated by the Your Host corporation's restaurants; all of them generated goodwill that they shared equally. We found that the advantage of being a Your Host Restaurant flowed primarily from the local advertising and shared management. This was supported by the fact that the Rochester restaurants nearly failed due to absentee management problems. The Tax Court concluded that the Your Host corporation provided no service or benefit to the other 10 corporations for which it was not already adequately compensated.[29]

Here, the hotels operated by the Hyatt International group have only a limited amount of similarity to the restaurants in Your Host, Inc. v. Commissioner, supra and the same result does not obtain. HHK and HS through management and local advertising generated goodwill that benefited Hyatt International hotels and entities in their regions and beyond. We have held that the arm's-length royalty for the Hyatt trade names and marks from HIC to Hyatt Domestic is .4 percent of the Hyatt International group's total hotel gross revenues. As the holder of the international license to the Hyatt trade names and marks, HIC's income should be increased by two-fifth of 1 percent of the gross revenues of those hotels whose management fees, taking into

---

[29] As previously noted, the parties posed an all-or-nothing type question to the Court on the sec. 482 issues. See Your Host, Inc. v. Commissioner, 58 T.C. 10, 29 n.4 (1972), affd. 489 F.2d 957 (2d Cir. 1973).

consideration the adjustments for the allocation of fees, were remitted to HHK and HS.[30]

D. <u>Allocation to HIC for Management Services</u>

Beyond limited expense allocations, HIC's subsidiaries did not pay for services provided by HIC. Respondent determined that income should be allocated to HIC from its subsidiaries for management services. Respondent relies on the provision of the following services in support of allocations: Manuals, training, human resource development, employee benefits, contract review, financial systems and advice, business development assistance, preopening services, owner relations, marketing, and HIC's efforts at building the IMAGE reservations system.

Petitioners contend that, for the most part, all management fees were reported by the entity that earned them. Petitioners also argue that what HIC did for its subsidiaries was stewardship or duplication and as such is not subject to section 482 allocations. Petitioners assert that the design and chain services were provided to and paid for separately by the hotel owners, not the subsidiaries, and thus were by definition arm's-length transactions not subject to section 482. Petitioners also

---

[30] This allocation is for the Hyatt trade names and marks. We consider the other items proposed by respondent, through his expert BVS, in the royalty--i.e., corporate overhead and development activities--under the topic of management services, below.

allege that there was little IPS activity during the years in issue.

Allocations may be made where one member of a controlled group performs services for the benefit of, or on behalf of, another member of the group.  See sec. 1.482-2(b)(1), Income Tax Regs.  "Allocations will generally not be made if the service is merely a duplication of a service which the related party has independently performed or is performing for itself."  Sec. 1.482-2(b)(2)(ii), Income Tax Regs.; see Young & Rubicam, Inc. v. Commissioner, 187 Ct. Cl. 635, 410 F.2d 1233 (1969).  In addition, section 482 allocations are inappropriate for stewardship activities because the benefit is to the parent entity.  See Young & Rubicam, Inc. v. United States, 410 F.2d at 1245-1247; Eli Lilly & Co. v. Commissioner, 84 T.C. at 1154; Columbian Rope Co. v. Commissioner, 42 T.C. at 813-814.  We find that items such as HIC's audits, reporting requirements, reviewing contracts, and providing for consistency of accounting systems are supervisory functions that benefited the parent company and are not management services.  See Young & Rubicam, Inc. v. United States, 410 F.2d at 1245-1247.  Likewise, business development activities, financial guaranties, and owner relations are to the benefit of the parent company and not subject to allocation.  See id.  However, we are, likewise, not persuaded by petitioners' argument that chain and design services should not

be subject to section 482 allocation because they were provided to the owners, who are unrelated parties.  Although the charges for these services were billed to the owners, the services were provided as part of the Hyatt International group's hotel management business.  However, any allocation must take into account the costs that have already been paid.  Accordingly, the remaining arm's-length issues for our consideration involve:  The services HIC performed with respect to worldwide marketing, chain and design services, and coordination of human resources, insurance, and employee benefits.

First, however, we consider petitioners' assertion that the appropriate measure of arm's-length consideration for the services provided by HIC is cost.  Section 1.482-2(b)(3), Income Tax Regs., defines an arm's-length charge for services rendered as:

> the amount which was charged or would have been charged for the same or similar services in independent transactions with or between unrelated parties under similar circumstances considering all relevant facts. However, except in the case of services which are an integral part of the business activity of either the member rendering the services or the member receiving the benefit of the services (as described in subparagraph (7) of this paragraph), the arm's length charge shall be deemed equal to the costs or deductions incurred with respect to such services by the member or members rendering such services unless the taxpayer establishes a more appropriate charge under the standards set forth in the first sentence of this subparagraph.  * * *  [Emphasis added.]

Thus, petitioners are correct that, under certain circumstances, the cost of providing the services may be treated as the arm's-length consideration in lieu of the amount that an unrelated party would charge. This is permitted where the services are not an integral part of the business of either the renderer or the recipient of the services. Respondent argues that all of the services provided by HIC were integral to its business. Conversely, petitioners argue that none of the services were integral to the business.

Section 1.482-2(b)(7)(i) through (iv), Income Tax Regs., describes situations in which services shall be considered an integral part of the business activity of a member of a group of controlled entities.[31]

_____

[31]  In pertinent part, the section 1.482-2(b)(7)(i) through (iv), Income Tax Regs. provides:
  (i) Services are an integral part of the business activity of a member of a controlled group where either the renderer or the recipient is engaged in the trade or business of rendering similar services to one or more unrelated parties.

  (ii) Services are an integral part of the business activity of a member of a controlled group where the renderer renders services to one or more related parties as one of its principal activities.

  *    *    *    *    *    *    *

  (iii) Services are an integral part of the business activity of a member of a controlled group where the renderer is peculiarly capable of rendering the services and such services are a principal element

(continued...)

Petitioners' expert conceded that the services of IPS were integral in that those services were provided to unrelated parties, although petitioner's expert also concluded that IPS' activities were minimal during the years in issue. It appears that IPS was uniquely capable of providing its services since the design manuals and area programs, although tailored to suit a particular hotel, were intended to exemplify how a Hyatt International hotel should be constructed or operated. No other design company would have access to this information. Thus, we find the activities of IPS are integral. Other services, including marketing and coordination of insurance and benefits were performed and may be integral, but there is no way to distinguish the costs of the other services provided to HHK and HS from the total costs to the Hyatt International group entities. The subsidiaries or the hotel owners paid the direct costs; however, the indirect costs (i.e., overhead) were not included. Thus, whether we conclude that such services were or were not integral, we are effectively unable to determine the

---

[31](...continued)
in the operations of the recipient.

　　(iv) Services are an integral part of the business activity of a member of a controlled group where the recipient has received the benefit of a substantial amount of services from one or more related parties during its taxable year. * * *

costs for the services rendered to HHK and HS.[32]  Accordingly, we use a different approach in measuring arm's-length consideration for HIC's services.

The BVS report contains the conclusion that a royalty consisting of 33 percent of adjusted management fees be paid by HHK and HS to HIC, plus a profit split of 50 or 65 percent (depending on the year) of their operating income remaining after expenses and the above royalties are deducted.  The royalty allocation was for trade names and marks, profit on reservations, and overhead.  BVS intended the profit split to cover the financial guaranties and differences in assets, with HIC being the owner of the intangibles and the financial capital.

A major impetus for BVS' allocations appears to be the opinion that HIC bore the majority of the consolidated expenses of the Hyatt International group and that HHK and HS received most of the revenue.  BVS' choice of percentages appears to be based on the above-stated premise.  In particular, the BVS report contains the statement:

> The reallocation process yields a much more balanced distribution of operating income and adjusted operating income.  * * *  It is only after the profit-sharing and

---

[32] Although petitioners have argued that the one-time overhead charge in 1983, as a result of challenged deductions, is the appropriate amount, they have provided us with no factual predicate for accepting this argument.  Obviously, respondent's determinations reflect disagreement about the sufficiency of the one-time charge.

royalties are adjusted for, that HIC, HHK and HS appear
to have the proper relationships in terms of adjusted
operating income.   * * *

The perceived imbalance was due to the absence of hotel
expenses on the management subsidiaries' books and the fact that
numerous HHK's and HS' expenses were absorbed by the flagship
hotel's sharing of space and employees.  Some of HIC's expenses,
however, were attributable to its role as a parent organization
and as the management entity for hotels in Europe, Central
America, and parts of the Middle East and would not be
attributable to HHK and HS.  BVS considered the expenses of HIC
and its U.S. subsidiaries but limited the comparison to the
operating revenues.[33]  BVS did not consider the fact that HIC
received dividends as a "parent" and that some of the dividend
income could be associated with the management relationship.
Significantly, BVS' profit-split methodology was intended to
reflect the proportion of assets each entity had contributed.
That narrowly focused approach overlooks the contribution of
labor and expertise, which are the most important elements in a
service industry.  Although BVS' methodology was designed to rely
on asset proportioning, BVS' conclusion essentially relies on

---

[33]  It appears that BVS' analyses exclude the losses
incurred from the expenses of HIC for the hotels in Brussels and
Nice.

guideline transactions rather than on the entities' comparative asset holdings.

BVS selected certain Hyatt International agreements as guideline transactions and concluded that there were implied royalties of 33 percent in the Aryaduta agreement and 25 percent in the HESA agreements.  The 33-percent royalty derives from the potential decrease of revenue that would have occurred had the name change negotiated in January of 1986 been implemented for 1988 and 1989.  The name, however, did not change until 1991 when the second Hyatt International hotel opened in Jakarta.  Given that the Hyatt International group needed the hotel owners of the Aryaduta to agree to drop the name in order to secure the deal for the newer and potentially more profitable Grand Hyatt, the transaction should not be considered an arm's-length transaction with neutral parties who are under no compulsion to engage in the transaction.

Further complicating the Aryaduta transaction, the management fee rates were negotiated downward to reflect removal of the Hyatt name, and the hotel owners agreed to add rooms to their hotel, thus increasing the revenue base by the time the name change occurred.  There were other similar instances where fees, expressed in percentages, were scheduled to decrease when the number of rooms managed increased; e.g., the HESA agreements and agreements with owners of multiple hotels.  The BVS report

does not contain an explanation of the reason the implied 33-percent royalty rate (for name only in the Aryaduta transaction) was selected over the implied 25-percent rate for trade names, marks, and chain services (HESA). The BVS report merely contains the statement that:

> A royalty rate of 33% was found to have still allowed both HHK and HS to produce a very high return on assets and high overall profitability. A royalty rate as high as 50% could have been supported in certain periods.

In support of its approach on the profit split, BVS stated that:

> The approximately 50% split in the net revenue of HESA provides a guideline uncontrolled transaction that suggests that, at most, HHK and HS would have been entitled to half of the value of their respective adjusted operating incomes after royalties. * * *

For HHK, BVS used a 65-percent split, to be allocated to HIC for the years 1976 through 1981, with 50 percent for the remaining years. For HS, BVS used a 75-percent split for 1976, 65-percent for 1977 through 1982, and 50-percent thereafter.

These profit splits, according to respondent's expert, recognized HIC's contribution of intangibles. We note that was also one of the purposes of the 33-percent royalty. BVS references the split as being "approximately 50%," but it actually used 75, 65, and 50 percent (depending on the specific year). These percentages more closely resemble the consulting fee paid by HESA to HHK, which we have found to be an arrangement

for the purpose of reducing foreign tax.  In connection with the
HESA joint venture, the Hyatt International group provided the
local staffing and management talent, while VIS provided the
hotel contracts.  We have found that HHK and HS played important
roles in both of these functions within their territories.  Thus,
the relationship between HIC and VIS does not resemble the
relationship between HIC and HHK or HS.  In addition, the
ownership share of HIC (Mexico) in HESA was 49 percent.  A
corporate shareholder/owner is entitled to a portion of any
dividends distributed.  As HHK and HS are wholly owned
subsidiaries of HIC, HIC would be entitled to 100 percent of
their dividends.  Those considerations, however, do not address
the share, if any, of operating income that HIC should receive.
In these respects, the BVS report was not helpful and did not
assist us in our consideration of an appropriate arm's-length
consideration for the services provided by HIC.[34]

Once again, we are left stranded in a "sea of expertise" and
must navigate our own way through a complex record to decide what
constitutes an appropriate arm's-length consideration.  For the
reasons we have explained, the parties' notice and trial
positions do not properly address the type of circumstances we

_____

[34] Since the parties have not provided adequate factual
basis for differentiation among the several years in issue, we
disregard BVS' approach of allocating different percentages in
different years.

have found.  Accordingly, we looked for other alternatives.  The Budapest agreement resembled the type of package that the Hyatt International group provided to those hotels where local management was not provided.  It included preopening and technical services, management expertise, chain services, and the trade names and marks.  The Odakyu agreement provided for the use of the names and marks, chain services, manuals, among other things, and provided us with some guidance.  The hotels involved in that agreement used their Century names in conjunction with the Hyatt names and also had the benefit of Hyatt chain services.  Unfortunately, there is insufficient information to enable the fee structure for the Budapest or Odakyu agreement to be translated, extrapolated, and applied to the other transactional relationships in the Hyatt International group.

As we have already explained, the franchise relationship is analogous to the relationship between HIC and its hotel management subsidiaries.  HIC did not operate the hotel; it provided services to the management companies.  Accordingly, we see the franchise rates as the most indicative of arm's-length consideration for the services that HIC provided.  We also recognize, however, that the master hotel management subsidiaries such as HHK and HS worked in conjunction with HIC to provide those franchise type intangibles and services to the hotel operators under their supervision, assisting in the writing of

the manuals and consulting with the local hotel executive staff.

Yet petitioners have provided precious little guidance for us to

determine an appropriate offset for the services supplied by HHK

and HS.[35]  We are satisfied, however, that our holding allows HHK

and HS reasonably adequate compensation for their efforts as

hotel management companies, unlike respondent's notice of

deficiency determinations.

As already discussed, franchise rates during the relevant

period were equivalent to about 2 percent of hotel gross

revenues.  We have held that the arm's-length charge for the

Hyatt trade name and marks is .4 percent of hotel gross revenues.

That holding was based on a 2-percent franchise rate, with 1

percent being attributable to expenses and the other 1 percent to

profit on reservations, marketing, expertise, other services, and

a royalty for trade names and marks.  We considered one-half of

1 percent as the limit attributable to the royalties.  In

arriving at a two-fifths of 1-percent royalty rate we favored

petitioner's position that trade names and marks are less

important in the international marketplace.  The reallocable

services provided by HIC coincide with those provided in a

---

[35]  Part of this is due to HHK and HS's use of hotel staff
in dual capacities and their ability to pass on expenses to the
hotel owners in most of years in issue herein for which they
supplied no records of hours spent or costs incurred, leaving us
without the means to measure their contributions.

franchise arrangement.  Therefore, we hold that HIC's income should be increased by 1.5 percent of the gross revenues of those hotels whose management fees were remitted to HHK and HS, taking into consideration the adjustments already discussed.[36]  The 1.5-percent rate consists of 1 percent for expenses and .5 percent for profit based on a franchise model.

To reflect the foregoing and considering the parties' stipulations of settled issues and the fact that additional issues remain for resolution,

<u>An appropriate order</u>

<u>will be issued.</u>

---

[36]  This allocation should be offset by the overhead charges already taken in 1983.

APPENDIX

